THOMAS WATSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7554. Promulgated March 21, 1947.

570

*Thomas Watson,* pro se.
*Brooks Fullerton, Esq.,* for the respondent.

## OPINION.

JOHNSON, *Judge*: 1. On his income tax return for 1940 petitioner claimed a bad debt deduction of $13,150 on account of final payment of the obligation under notes, originally aggregating $15,475, which Green Road gave him in 1934 for cash advances and which the Colonial Trust Co. immediately discounted on his endorsement, paying him the proceeds. Because he simultaneously borrowed $13,150 from the trust company by a new note and he reports his income for tax purposes on the basis of cash receipts and disbursements, as a precautionary measure he claimed the same deduction for 1941, when he paid the new note. The Commissioner disallowed the deduction for 1940 and allowed it for 1941; by affirmative plea he now contends that it is not deductible for 1941 either.

The complexity of circumstances affecting the issue and the parties' several contentions relating to it require a condensed elucidation of the facts, of former decisions of this Court having a bearing on those facts, and of the parties' multiple arguments. In the year 1934 petitioner owned 1,350 of the 1,400 outstanding shares of Green Road, an insolvent construction corporation, to which he had advanced operating funds for several years. These advances were normally credited to him in an open ledger account, and "in partial payment" of the debts so evidenced, Green Road in 1929 and 1930 gave him 3 interest-bearing notes of an aggregate face amount of $19,100, which he promptly endorsed and had discounted by the Colonial Trust Co., a bank. It is stipulated that: "Said three notes were not charged against petitioner on his account on Green Road's ledger at the time the notes were given." And, as it does not appear that they were ever charged later, we assume that Green Road's indebtedness in the amount of $19,100 as evidenced by the notes was thereafter reflected in the ledger account.

In December 1934 Green Road was liquidated, and its assets were transferred to the South Euclid Stone & Supply Co. under an agreement whereby the purchaser gave its four notes for an aggregate of $32,000, secured by a chattel mortgage on the assets, and petitioner and his brother, the liquidating trustees, accepted "said notes as payment and satisfaction in full of all their individual claims against the Green Road Stone & Supply Company" and agreed to assume and pay all taxes and other obligations of Green Road. At that time the ledger account indicated that Green Road owed petitioner $128,349.42, which amount included, we must assume, the $19,100 also evidenced by the notes. By partial payments to the bank upon renewals of the notes petitioner had then reduced their principal unpaid amount to $15,475.

On his income tax return for 1934 petitioner deducted $91,888.76 as a bad debt resulting from his advances to Green Road. The Commissioner disallowed the deduction on the ground that the advances represented capital investments in Green Road's stock, and allowed instead a capital loss limited to $2,000. Petitioner contested the determination, and by a memorandum opinion entered December 14, 1940, in *Thomas Watson*, Docket No. 97638, the United States Board of Tax Appeals held him entitled to a bad debt deduction of $87,-774.42. This figure reflected the $128,349.42, shown in the ledger account, plus $9,900 which was shown advanced but not credited to the account, or a total of $138,249.42, and that total of indebtedness was then reduced by $15,475, the unpaid amount of the discounted notes, and by $35,000, which petitioner received from the liquidation and which included the $32,000 face amount of the four notes given by the South Euclid Co. for Green Road's assets. The Board affirmatively held that petitioner's advances to Green Road resulted in debts to him and did not constitute an investment in its stock.

In succeeding years petitioner continued to renew and to reduce the unpaid principal of the notes so that in December 1940 it aggregated $13,150. He then individually borrowed $13,150 from the Colonial Trust Co. and paid off the old notes. He borrowed more money in 1941, merging the debt of his last note into new notes, and in December 1941 he paid off the latter. Prior to this time and in 1938 petitioner foreclosed his chattel mortgage on the Green Road assets conveyed to the South Euclid Co., which had defaulted in payment of its four notes aggregating $32,000, and pursuant to the decision of this Court rendered December 7, 1945, in Docket No. 2362, he was allowed to deduct the resulting loss.

(a) From the foregoing review it seems evident and pertinent to the issue raised that the $15,475 unpaid on the discounted notes is indistinguishable as to character from the total of $138,249.42 which

the Board held to be debts of Green Road to petitioner. These debts it held properly deductible in 1934 to the extent that they were not paid by the $35,000 which petitioner received from Green Road and to the extent that they were represented by the amount of the unpaid notes here in controversy. The Board's exclusion of this latter amount from petitioner's bad debt deduction for 1934 was required by the settled principle that a taxpayer who reports income on the basis of cash receipts and disbursements must suffer a cash detriment before taking a deduction. *Eckert* v. *Burnet*, 283 U. S. 140. It is not enough that such detriment is reasonably certain at some future time. Having obtained money on the notes from a bank in prior years, petitioner in 1934 held the funds which he had advanced Green Road for the notes, and while as endorser he might reasonably anticipate the loss of it in having to pay the notes himself, such payment did not occur in that year, and hence no deduction was allowable until such payment should be made. As the obligation of the notes (apart from small reductions) was continued by renewals and later by the substitution of petitioner's individual note until cash payment in 1940 or 1941—the year of payment is the subject of a subsidiary issue—we are of opinion that the principle of *Eckert* v. *Burnet, supra*, fixes the year of cash payment as the proper year of deduction.

Ignoring the origin of the notes in a debt of Green Road to the petitioner, respondent defends his disallowance of the deduction by an argument based on the premise that petitioner's claim, if any, against Green Road resulted from payment of the notes as endorser. He recognizes that a guarantor, forced to pay under his guaranty, may deduct the payment as a bad debt if the guarantor is subrogated to the creditor's claim against a debtor from whom recovery is impossible. *Alice duPont Ortiz*, 42 B. T. A. 173; affd., *Wilmington Trust Co.* v. *Helvering*, 316 U. S. 164; *Daniel Gimbel*, 36 B. T. A. 539. But, he argues, petitioner can not be regarded as an endorser, guarantor, or surety because petitioner accepted the notes of $32,000 from the South Euclid Co. as satisfaction of his individual claims against Green Road and agreed further to assume all other obligations of Green Road. Having thus renounced all claims, petitioner was subrogated to no rights and, as the alleged debtor was not legally liable, there was no debt to become worthless, *Byus-Mankin Lumber Co.*, 46 B. T. A. 698, and nothing to deduct under the holding in *Howell* v. *Commissioner*, 69 Fed. (2d) 447; certiorari denied, 293 U. S. 654; and *Menihan* v. *Commissioner*, 79 Fed. (2d) 304; certiorari denied, 296 U. S. 651. Consequently, he reasons, petitioner was primarily liable to the bank, and, although the notes were ostensibly renewed by Green Road in later years with petitioner's endorsement, petitioner was in fact the primary maker, since the bank relied exclusively on the en-

dorsement and collateral for repayment. *Florence O. R. Lang et al., Executors*, 32 B. T. A. 522.

On the premise assumed respondent's argument has persuasive force, but we are of opinion that this premise is not adequate for a disposition of the issue, because it ignores the origin of the debt in advances by petitioner to Green Road and the reason for ·disallowance of the amount of the notes as a deduction in 1934. The Board of Tax Appeals found as a fact that petitioner's advances of $138,249.42 to Green Road were loans, not contributions to capital or investments in stock; that the indebtedness so created became, and was ascertained to be, partially worthless upon the liquidation of Green Road in 1934, and was properly deductible to the extent that it was not repaid by the $35,000 turned over to petitioner by the liquidating trustees. An integral part of that indebtedness, appearing with other entries of advances on petitioner's open account with Green Road, was represented by the notes for $19,100 which petitioner had endorsed and discounted and which had been reduced by payment to $15,475 when Green Road was liquidated. This part of the indebtedness was indistinguishable from other items of the partially worthless obligation as between Green Road and petitioner. But because it had, in a practical sense, been repaid by the bank, petitioner did not sustain a cash detriment when it was ascertained that Green Road could not pay it, and hence the Board excluded it in computing the amount of the bad debts deductible in 1934.

But this exclusion represented not a denial of its character as a bad debt, but only a postponement of the right to deduct because petitioner reported income on the basis of cash receipts and disbursements. Respondent stresses *Dreyfuss* v. *Commissioner*, 140 Fed. (2d) 922, as contrary to this view, but we find that decision readily distinguishable. Dreyfuss and his wife were majority shareholders of the insolvent Dallas Athletic Association, which was liquidated and dissolved in 1937. The liquidating trustees conveyed to Dreyfuss all of the corporate assets in consideration of his release of the corporation from debts owed him for moneys advanced and his assumption of all other debts of the corporation. These debts included bank loans guaranteed by him, and, when forced to pay the corporation's notes to the bank in later years, he sought to deduct such payments as bad debts. In holding the payments nondeductible, the court reasoned that:

\* \* \* Dreyfuss assumed all the Association's indebtedness, including the amount owed him, the consideration being all the assets of the Association. From the date of that sale and transfer, the debts of the Association became the debts of Sol Dreyfuss. \* \* \*

Respondent states in his brief that petitioner:

\* \* \* in consideration of the receipt of all the assets, released the corporation of all indebtedness due him and assumed and agreed to pay all other indebtedness of the corporation.

The evidence does not support this statement. The assets of Green Road were sold to the South Euclid Co., and the sale proceeds were applied to the partial payment of Green Road's debts to petitioner. The deduction of $87,774.42 for 1934 as a bad debt was sanctioned by the Board of Tax Appeals on the basis of such a holding, and we confirm it. Even although petitioner became primarily liable to the bank upon subsequent renewals of the notes here in controversy, by paying them in cash he first sustained the cash detriment essential to the exercise of his right to deduct the remainder of the debt ascertained worthless in 1934. That deduction was not lost by the legal incidents of notes which postponed his right to use it. Unlike Dreyfuss, petitioner bought no assets from Green Road, and his release of Green Road from liability for claims can not be construed as a purchase price, but rather as recognizing debts as uncollectible to the extent that they were not paid. We are of opinion, therefore, that petitioner is entitled to a deduction, and shall proceed to consider when it may be taken.

(b) Petitioner contends that his right to take the deduction became available in 1940 because in that year he paid the remainder due on the Green Road notes to the trust company in cash. It is stipulated that he so paid $300. It is also stipulated that he gave his check for $13,150 in full payment of the remainder on December 28, 1940, and that the trust company on that date surrendered to him the two notes. On the same day, however, he borrowed $13,150 from the trust company on his individual note, thereby again postponing the cash detriment which is essential to the deduction. He seeks to obviate the consequences of this loan by stressing that there was no substitution of one note for the other because the loan proceeds were deposited in his checking account with the trust company; that the checking account had a credit balance of $2,627.38 at the beginning of the day; and that $2,359.10 was also deposited in it during the day, so that in fact there was available $4,986.48 in addition to the loan proceeds, and, because those proceeds were thus commingled with other funds, it can not be held that the Green Road notes were paid by the loan, or, at least, not to the extent of $4,986.48.

We are not impressed with this argument, which was heretofore presented and rejected in *T. Harvey Ferris*, 38 B. T. A. 312; affd., 102 Fed. (2d) 985, wherein the Board said:

> * * * The intermediate step of crediting petitioner's account and checking against it was inconsequential and immaterial. Neither cash, nor the transfer of credit, nor their equivalent actually passed between the parties. We conclude that, on the facts here present, petitioner did not, within the meaning of the revenue act, "pay" the liability * * *

Petitioner attempts to distinguish the *Ferris* case on the ground that he had other funds in his account and had promised the trust company

to pay the Green Road notes from the loan proceeds "combined with the balance then in his checking account." Deposited funds are not earmarked, but, even if so, the recited understanding would seem to require the use of loan proceeds to the extent available. The doctrine here applicable, however, is not concerned with legalistic technicalities, but with practical effects, and all circumstances indicate that in effect petitioner merely substituted his individual note for the notes paid. This substitution was not the "payment" required as a condition precedent for the deduction, *George S. Silzer*, 39 B. T. A. 841; *Frank Kuhn*, 34 B. T. A. 274, and hence the deduction is not allowable in 1940. As the parties have stipulated that petitioner made cash payments of $300 on the notes earlier in 1940, however, that amount is properly deductible in that year as a bad debt.

(c) The evidence shows that during 1941 petitioner borrowed more money from the trust company and that his note for $13,150 was consolidated into a new note, on which $14,870.20 was unpaid on December 31, 1941. On that date he borrowed $4,000 from the trust company, giving a new note therefor, and deposited the proceeds in his checking account. On the same day he gave the trust company his check for $14,870.20, thereby paying the old note in full. Of the checking account's credit balance of $17,260.06, $4,000 represented the proceeds of the new loan and $13,260.06, the balance prior to that deposit. As the circumstances of the payment and the amounts of the note paid and the new note made rebut the inference of a substitution of the new note as made in partial settlement of the old, we hold that petitioner is entitled to deduct the $13,150 in 1941. *Newton A. Burgess*, 8 T. C. 47.

2. In 1941 petitioner sold $16,300 face value refunding bonds of South Euclid for $13,366, and reported a long term capital loss of $2,934, computed by use of $16,300 as cost. The Commissioner treated the entire sale proceeds, including $113.35 accrued interest, as long term capital gain, recognizing no cost or other basis at all. Respondent defends that determination, here arguing that petitioner has failed to meet his burden of establishing cost.

Petitioner's ownership of the bonds apparently had its origin in his acquisition of $18.000 face value notes of South Euclid which Green Road received from the village for construction work and in 1931 transferred to petitioner in part payment for petitioner's cash advances evidenced in his open account. The account was debited with $18,000, but in 1932 was credited with $3,000, representing the face value of such notes which petitioner delivered to the South Euclid Co. in payment of Green Road's obligation. Although this transfer should have left petitioner with notes of only $15,000, without alleging further acquisitions he introduced evidence that in 1934

he exchanged notes of $17,213.47 for series M bonds of $17,300, and in 1938 exchanged the series M bonds for refunding bonds of $17,300, of which he sold the $16,300 here in controversy below par.

Petitioner, ignoring the discrepancies in amounts, contends that since he acquired the original notes at par and since the refunding bonds were the second of two evidences of the same indebtedness, each substituted at par for the original obligation, it follows that his cost basis was par as he was repaid by the original notes for cash advances equal to their face value. Respondent argues that by the two successive exchanges petitioner acquired new bases, as the bonds differed in material respects from the notes and from each other, so that taxable exchanges resulted; that under such circumstances the fair market value of the series M bonds at the time of exchange in 1938 fixed the basis of the refunding bonds, and, as petitioner has not proved that value, he has failed to establish any basis.

The parties address themselves almost exclusively to the application of *Motor Products Corporation*, 47 B. T. A. 983; affd. per curiam (C. C. A., 6th Cir.), 142 Fed. (2d) 449, to the issue presented. A correct appraisal of the effect of that holding requires, we believe, a more extended examination of statutory provisions relating to basis than the parties have set forth. By section 113 (a) of the Internal Revenue Code the basis of property shall be its cost, except that:

(6) TAX-FREE EXCHANGES GENERALLY.—If the property was acquired, after February 28, 1913, upon an exchange described in section 112 (b) to (e), inclusive, or section 112 (1) the basis * * * shall be the same as in the case of the property exchanged. * * *

Petitioner does not expressly contend that either the exchange of notes for series M bonds in 1934 or the exchange of series M bonds for refunding bonds in 1938 fell within the exchanges described in the cited subsections, and an examination of those subsections indicates clearly that they did not. While section 112 (b) (1) provides that no gain or loss shall be recognized if property held for investment is exchanged solely for property of a like kind to be held for investment, exchanges of bonds and notes are expressly excluded by the Internal Revenue Code and were excluded under the revenue acts in effect when the exchanges were made. Sec. 112 (b) (1), Revenue Acts of 1934 and 1938.

In order to succeed in his contention petitioner must, therefore, demonstrate that no exchange of property occurred, or, if one did, that no gain or loss was recognizable by virtue of some other section of the code. By his exclusive reliance on *Motor Products Corporation, supra*, we infer that he denies any exchange. The corporate taxpayer in that case held defaulted municipal bonds of Detroit, is-

sued· in 1931. In accordance with a refunding plan to which the taxpayer agreed, it surrendered its certificates in 1934 and received instead certificates for bonds designated series A    The taxpayer contended that in the computing of gain upon its sale of some series A bonds in 1936 and upon the city's redemption of others in 1937, cost of the 1931 bonds should serve as basis because the exchange of certificates was "only a substitution of bonds evidencing the same continuing indebtedness of the city." In sustaining this contention the Board of Tax Appeals stressed that:

* * * The city's debt to petitioner was identically the same and the new evidence of that debt, refunding bonds, series A, was substantially identical in form with the old evidence thereof, the 1931 bonds exchanged therefor. Both were full faith and credit coupon bonds of the same denomination, evidencing an indebtedness of the city of Detroit for the same designated purpose; both were in the same principal amount, payable to bearer in lawful money of the United States; both bore the same rate of interest; and for both a sinking fund was provided for the payment of principal when due. Although they had different maturity dates, such dates were of little or no significance to petitioner as a creditor of the city, for the city under the old defaulted bonds could have paid off any part or all thereof while they remained in default at any time funds were available, and it likewise could have paid off any part or all of the new bonds, under its option, at any time when the first semiannual interest payment on the new bonds became due and funds were available; and in fact the city called for redemption all its new refunding bonds, series A, on February 15, 1937, and redeemed same. * * *

For these reasons the Board held that the exchange of certificates was not an exchange of property because the property which each represented was "substantially identical." This holding is based on the view that petitioner's "property," as represented by the old and new bond certificates, is to be treated for tax purposes as the same, and it does not involve a definition of the statutory term "substantially identical stock or securities," as used in section 118, which denies the deduction of a loss from "wash sales," or "property of a like kind," as used in section 112 (b) (1), relating to tax-free exchanges. Petitioner must here be held to the highest degree of analogy, for section 112 (b) (1) expressly excludes notes and bonds from exchanges to be deemed tax-free, *Forstmann* v. *Rogers*, 128·Fed. (2d) 126, and to succeed he must prove such substantial identity that there was no exchange of property at all.

The evidence does not warrant such a finding. The faith and credit of the village of South Euclid was pledged for payment of the notes and both bonds, and the principal amount of the indebtedness remained constant, but close analogy ends there; the notes bore 6 per cent interest and were payable in 2 years; the series M bonds bore 6 per cent interest and were payable in 10 years; the refunding bonds bore a graduated interest beginning at 1½ per cent and reaching 5

per cent after 20 years and were payable in 30 years, subject to prior redemption by lot. The difference in the character and terms of the several evidences of indebtedness are, in our opinion, of such a substantial nature that they can not be deemed to represent the same property for tax purposes. *Walter H. Field*, 41 B. T. A. 183; cf. *Marjorie K. Campbell*, 39 B. T. A. 916; affd., other point, 112 Fed. (2d) 530; reversed, other point, 313 U. S. 15; *Marie Hanlin*, 38 B. T. A. 811; affd., 108 Fed. (2d) 429. And, as petitioner by the exchanges acquired "a thing really different from what he theretofore had," gain or loss from them was recognizable, *Weiss* v. *Stearn*, 265 U. S. 242, even although not actually reflected in the computation of petitioner's taxes for the respective years in which the exchanges occurred. *Countway* v. *Commissioner*, 127 Fed. (2d) 69; *Gann* v. *Commissioner*, 61 Fed. (2d) 201; certiorari denied, 287 U. S. 650. Petitioner relies on *Commissioner* v. *Sun Pipe Line Co.*, 126 Fed. (2d) 888, affirming 42 B. T. A. 1413, wherein the issuance of 3½ per cent bonds in retirement of 5 per cent bonds was held not to create a new indebtedness within the purview of section 351 (b) (2) (B), Revenue Act of 1936, as amended. This section excluded from "undistributed adjusted net income" subject to the tax on undistributed earnings, amounts used to retire indebtedness incurred prior to 1934, and the question at issue was whether the obligation evidenced by the new bonds was the same debt formerly represented by the old bonds. In holding that it was, the Board of Tax Appeals based its conclusion on the premise that Congress, by that section and for its specific purpose, intended merely to deny the:

\* \* \* credit to indebtedness which is *new* in an economic sense to the tax-payer, i. e., does not merely take the place of indebtedness existing prior to the effective date. \* \* \*

We are of opinion that this holding is so limited to the object of the section and to its economic effect on the debtor as not to be applicable to the issue here presented. In any event the much greater decrease in interest rate in the refunding bonds and the change from notes to long term bonds by the first exchange present differences in degree sufficient to require a contrary conclusion.

Having acquired the refunding bonds in exchange for series M bonds in 1938, petitioner's cost of the former is the fair market value of the series M bonds when given in exchange. There is evidence that on October 24, 1938, series M bonds of a par value of $6,000 were sold at 42, and we accordingly hold that the $16,300 face value refunding bonds which petitioner sold in 1941 had a basis of $6,846.

3. Petitioner contests the Commissioner's disallowance for 1941 of a claimed bad debt deduction of $300, representing money which he had advanced to A. C. Stickel in 1938 for use in a proposed joint in-

vestment. The investment was not made, and Stickel, recognizing his obligation to repay, promised petitioner from time to time that he would do so. In 1941 Stickel filed a petition in bankruptcy, declaring that he had no assets.

While the evidence is meager, we are satisfied that an indebtedness resulted from the advance and that the petition in bankruptcy reasonably supports an ascertainment of worthlessness. Respondent suggests that the debt may have become worthless prior to 1941, and that petitioner has failed to prove that it did not. But petitioner's business relations with Stickel and Stickel's promises to repay, coupled with the small amount of the debt, rebut any inference that worthlessness could have been reasonably ascertained in a prior year. The deduction should be allowed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*