DONALD L. WILKERSON AND MARY A. WILKERSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9565–75—9567–75, 9658–75, 10925–75—10930–75.

Filed May 17, 1978.

*Ernest J. Maupin III* and *Fred L. Oats,* for the petitioners. *Nicholas G. Stucky* and *Rebecca T. Hill,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners as follows:

---

[1]Cases of the following petitioners are consolidated herewith: Nick L. Lusich and Jacqueline E. Lusich, docket No. 9566–75; Lawrence F. Devincenzi, docket No. 9567–75; F. Albert Kuckhoff and Jean M. Kuckhoff, docket No. 9658–75; Ben Caramella and Cecile Caramella, docket No. 10925–75; Donald L. Wilkerson and Mary A. Wilkerson, docket No. 10926–75; Maurice J. Nespor and Anita M. Nespor, docket No. 10927–75; Theodore E. Selden and Lonnie A. Selden, docket No. 10928–75; Joseph F. McDonald and Mary G. McDonald, docket No. 10929–75; John T. Hargrove and Ruth D. Hargrove, docket No. 10930–75.

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 9565–75 | Donald L. Wilkerson and Mary A. Wilkerson | 1972 | $12,489.00 |
| 9566–75 | Nick L. Lusich and Jacqueline E. Lusich | 1972 | 5,065.00 |
| 9567–75 | Lawrence F. Devincenzi | 1972 | 15,781.27 |
| 9658–75 | F. Albert Kuckoff and Jean M. Kuckhoff | 1972 | 1,545.00 |
| 10925–75 | Ben Caramella and Cecile Caramella | 1971 | 2,515.00 |
| 10926–75 | Donald L. Wilkerson and Mary A. Wilkerson | 1971 | 5,821.00 |
| 10927–75 | Maurice J. Nespor and Anita M. Nespor | 1971 | 1,105.00 |
| 10928–75 | Theodore E. Selden and Lonnie A. Selden | 1971 | 5,200.00 |
| 10929–75 | Joseph F. McDonald and Mary G. McDonald | 1971 | 8,574.93 |
| 10930–75 | John T. Hargrove and Ruth D. Hargrove | 1971 | 3,172.50 |

Various concessions have reduced the issues for our decision to these:

(1) What portion, if any, of "initial service charges" or "finance fees" incurred in connection with certain FHA-insured housing projects constitutes interest under section 163(a), I.R.C. 1954?[2]

(2) To the extent a portion constitutes interest, was it "paid" in the taxable years in issue within the meaning of section 163(a) of the Code?

(3) If all or a portion of the charge/fee is determined to be a service charge rather than interest, over what period of time must the service charge be amortized and deducted?

## FINDINGS OF FACT

### Willowbrook Apartments Partnership

Petitioners are all individuals who, at the time the petitions were filed, resided in Washoe County, Nev.

Petitioner Joseph F. McDonald was, at all times relevant hereto, the general partner of Willowbrook Apartments with a 25-percent interest in the capital and profits and losses of the partnership. Petitioners Ben Caramella, Donald L. Wilkerson, Maurice J. Nespor, Theodore E. Selden, and John T. Hargrove

---

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise indicated.

were, at all times relevant hereto, limited partners with the following percentage interests in the capital and profits and losses of the limited partnership:

| Partner's name | Percentage |
| --- | --- |
| Ben Caramella | 3.75 |
| Donald L. Wilkerson | 10.00 |
| Maurice J. Nespor | 4.00 |
| Theodore E. Selden | 12.00 |
| John T. Hargrove | 10.00 |

Petitioners Cecile Caramella, Mary A. Wilkerson, Anita M. Nespor, Lonnie A. Selden, Mary G. McDonald, and Ruth D. Hargrove are the wives of the foregoing petitioners and are joined in this action as petitioners as a result of the joint Federal income tax returns they filed with their respective husbands for the calendar year 1971.

Willowbrook Apartments is a Nevada limited partnership that reports for Federal income tax purposes on the cash basis of accounting. The taxable year of the partnership was the calendar year. All petitioners were, at all times relevant hereto, cash basis taxpayers whose taxable years were the calendar year.

Willowbrook Apartments was formed for the purpose of acquiring, developing, building, and operating a 183-unit apartment project in Reno, Nev., under section 221(d)(4) of the National Housing Act and the regulations thereunder.

During the calendar year 1971, Willowbrook Apartments submitted to the Federal Housing Commissioner and Mason-McDuffie Investment Co. of Nevada an application for a loan in the principal amount of $3,126,300 to be insured by the Federal Housing Administration (FHA) under the provisions of section 221(d)(4) of the National Housing Act.

As part of the loan application, Mason-McDuffie, the proposed lender, represented to the Federal Housing Commissioner when requesting a firm commitment to insure a mortgage covering the subject property as follows:

After examination of the application and the proposed security, [Mason-McDuffie] considers the project desirable and is interested, subject to the issuance of a firm commitment by FHA, in making a loan in the principal amount of $3,126,300, which will bear interest at seven per cent, * * *

On September 28, 1971, the Federal Housing Commissioner

issued to Mason-McDuffie and Willowbrook Apartments its commitment to endorse for insurance under the provisions of section 221(d)(4) of the National Housing Act, and the regulations thereunder, a mortgage note in the amount of $3,126,300, to be secured by a mortgage on the property on which the apartment project was to be constructed.

On October 19, 1971, Mason-McDuffie applied with the Government National Mortgage Association (GNMA) for a commitment to purchase the promissory note and deed of trust following the completion of the construction, the final disbursement of the loan proceeds, and the final endorsement of the loan for insurance by FHA. On November 10, 1971, GNMA issued its commitment to so purchase the note and deed of trust. In consideration for the commitment, GNMA required a commitment fee of 1 percent of the face amount of the loan, or $31,263. This amount was paid by Willowbrook Apartments in November of 1971. Although Mason-McDuffie was not obligated to sell the promissory note to GNMA, Mason-McDuffie's practice was to sell the note at final closing pursuant to the terms of the commitment, and Mason-McDuffie certified to FHA that it had a firm commitment from GNMA.

After receiving from the Federal Housing Commissioner the commitment for insurance of advances, and after receiving from GNMA its commitment to purchase the promissory note and deed of trust following final endorsement by the Federal Housing Commissioner, Willowbrook Apartments entered into a building loan agreement with Mason-McDuffie. The proceeds of the loan were to be used for the construction of the 183-unit apartment project and for the payment of various charges and fees to be incurred by Willowbrook, including the $62,526 "initial service charge or financing fee."

On November 24, 1971, Willowbrook Apartments executed, and the Federal Housing Commissioner endorsed (the "initial endorsement"), a promissory note payable to the order of Mason-McDuffie in the face amount of $3,126,300, together with a deed of trust on the apartment project to secure the promissory note. The note, as originally executed by Willowbrook to Mason-McDuffie, or order, was for a term of 41½ years at an interest rate of 7 percent per annum. The note provided for "interest only" payments for 1½ years (until June 1, 1973), and

installment payments of principal and interest for the remaining 40 years.

The building loan agreement required Willowbrook Apartments to pay to Mason-McDuffie an "initial service charge" of 2 percent of the face amount of the loan, $62,526. The two parties agreed that the $62,526 initial service charge or financing fee due from Willowbrook to Mason-McDuffie would be advanced by Mason-McDuffie from the loan proceeds if not otherwise paid by Willowbrook. Willowbrook was not, however, obligated to pay the charge or fee solely from the loan proceeds. The charge or fee represented 2 percent of the face amount of the loan; the amount is governed by FHA regulations. The applicable provision, section 221.508 of the FHA regulations, provides as follows:

> Maximum fees and charges by mortgagee.
> The mortgagee may collect from the mortgagor the amount of the fees provided for in this subpart. The mortgagee may also collect from the mortgagor an initial service charge in an amount not to exceed 2 percent of the original principal amount of the mortgage, to reimburse the mortgagee for the cost of closing the transaction. Any additional charges or fees collected from the mortgagor shall be subject to prior approval of the Commissioner.

The charge or fee is a nonrefundable payment to the mortgagee.

Facts relating to "payment" of the initial service charge or financing fee are as follows:

(1) On November 24, 1971, $537,500.50, representing the first payment under the loan from Mason-McDuffie, was deposited in Willowbrook Apartments' general checking account at Valley Bank of Nevada, Reno, Nev. (The checking account had been opened about a month earlier with a $2 deposit. No other deposits were made and no checks were drawn as of November 23, 1971.) The $537,500.50 loan advance was made pursuant to a form "Request for Payment" submitted by Willowbrook that itemized the payments requested. The itemization included the $62,526 charge or fee here in question. Although Willowbrook was contractually obligated to pay the $62,526 to Mason-McDuffie, Willowbrook was given unrestricted physical control over the loan advance at the time it was deposited in the Valley Bank of Nevada account. Manson-McDuffie was not a signatory to the bank account. If Willowbrook had not paid the $62,526 to Mason-McDuffie, it would have been in default under the terms

of the loan, and Mason-McDuffie would not have continued to advance funds under the construction contract.

(2) Also on November 24, 1971, Mason-McDuffie applied to FHA for insurance of the contemplated advance, and FHA (on the same day) approved and certified the advance for mortgage insurance, stating that the entire amount (including the $62,526) when advanced would "thereupon constitute principal" of the previously executed mortgage. Mason-McDuffie certified to the FHA that the $62,526 "initial service charge" had "been collected or will be so collected not later than the date of the initial endorsement." (The date of the initial endorsement was also November 24, 1971.)

(3) On November 26, 1971, Willowbrook Apartments issued a check on its general account payable to the order of Mason-McDuffie for $62,526, representing payment of the 2-percent charge or fee. The balance of the general account at the opening of business on November 26, 1971, according to bank records, was $496,391.42. Donald L. Wilkerson (petitioner's witness, vice president of Mason-McDuffie, and limited partner of the partnership here involved) could not explain the discrepancy between Mason-McDuffie's certification to the FHA that the $62,526 would be collected by November 24, 1971, and the November 26, 1971, date on the check.

(4) On November 29, 1971, an additional deposit of $45,000 was made into the checking account, representing capital contributions of some of the limited partners.

(5) On December 1, 1971, the check issued November 26, 1971, cleared the checking account. The balance of the account immediately prior to clearance of the check was, according to bank records, $180,632.50.

(6) On December 2, 1971, an additional $65,000 was deposited into the checking account, representing additional capital contributions of other partners.

The 2-percent charge or fee of $62,526 was deducted by the Willowbrook Apartments partnership on its 1971 Federal income tax return as interest expense.

Construction of the apartment complex commenced December 1, 1971, and was completed July 7, 1973.

The final endorsement or final closing does not occur in FHA projects until the completion of a cost certification by an independent certified public accountant, completion of a final

survey, and correction of any construction defects. The promissory note here involved was endorsed (the "final endorsement") for insurance by the Federal Housing Commissioner in July 1974.

On July 18, 1974, the Federal National Mortgage Association (FNMA) purchased the loan in accordance with the terms of the November 10, 1971, commitment from GNMA. In accordance with the terms of the commitment, the loan was purchased for 96 percent of its face amount, plus accrued interest, and less purchasing and marketing fees of one-half percent. The 4-percent purchase discount and the purchasing and marketing fees were paid by Willowbrook Apartments.

### The Meadows East Partnership

Petitioners are individuals who, at all times relevant hereto, resided in Washoe County, Nev. Petitioners Donald L. Wilkerson, Lawrence F. Devincenzi, Nick L. Lusich, F. Albert Kuckhoff, and Jean M. Kuckhoff were, at all times relevant hereto, limited partners of the Meadows East, a Nevada limited partnership (hereinafter Meadows East). Following are the percentage interests of these limited partners in the capital and profits and losses of the partnership:

| Partner's name | Percentage |
|---|---|
| Donald L. Wilkerson | 10.00 |
| Lawrence F. Devincenzi | 5.00 |
| Nick L. Lusich | 5.00 |
| F. Albert Kuckhoff | 1.00 |
| Jean M. Kuckhoff | 1.00 |

Petitioners Mary A. Wilkerson and Jacqueline E. Lusich are the wives of Donald L. Wilkerson and Nick L. Lusich. They are parties to this case as a result of the joint Federal income tax returns they filed with their husbands for the calendar year 1972. Petitioner Joseph F. McDonald was, at all times relevant hereto, the general partner of Meadows East.

Meadows East is a Nevada limited partnership that, at all times relevant hereto, reported for Federal income tax purposes on the cash basis. Its taxable year was the calendar year. Similarly, all petitioners were, at all times relevant hereto, cash basis taxpayers whose taxable years were the calendar year.

Meadows East was formed for the purpose of acquiring,

developing, building, and operating a 200-unit apartment project in Sparks, Nev., under section 236 of the National Housing Act and the regulations thereunder.

During 1972 Meadows East submitted to the Federal Housing Commissioner and Mason-McDuffie Investment Co. of Nevada an application for a loan to be insured under section 236 of the National Housing Act. The loan proceeds were to be used for construction of the 200-unit apartment project and for payment of related costs and fees.

On November 9, 1972, the Federal Housing Commissioner issued to Mason-McDuffie Investment Co. of Nevada and Meadows East a commitment to endorse for insurance under the provisions of section 236 of the National Housing Act and the regulations thereunder a mortgage note in the amount of $3,142,300, to be secured by a mortgage on the property on which the apartment project was to be constructed.

After receiving the commitment for insurance of advances from the Federal Housing Commissioner, Meadows East and Mason-McDuffie applied with GNMA for a commitment to purchase the promissory note and deed of trust upon the completion of construction and the final endorsement of the loan by FHA. On November 29, 1972, GNMA issued its commitment to purchase the promissory note and the deed of trust following the completion of construction, the final disbursement of the loan proceeds, and the final endorsement of the loan for insurance by FHA. In consideration for the commitment, GNMA required a commitment fee of 1 percent of the face amount of the loan, or $31,423. This amount was paid by Meadows East in December 1972. Although Mason-McDuffie was not obligated to sell the promissory note to GNMA, Mason-McDuffie's practice was to sell the note at final closing pursuant to the terms of the commitment, and Mason-McDuffie certified to FHA that it had a firm commitment from GNMA.

On December 5, 1972, a building loan agreement was entered into between Meadows East and Mason-McDuffie. The building loan agreement required Mason-McDuffie to provide the financing for the construction of the 200-unit apartment project. The amount of the loan was agreed to be $3,142,300. The building loan agreement required the payment by Meadows East to Mason-McDuffie of an "initial service charge" of 2 percent of the face amount of the loan, or $62,846. The two parties agreed

that the $62,846 initial service charge or financing fee due from Meadows East to Mason-McDuffie would be advanced by Mason-McDuffie from the loan proceeds if not otherwise paid by Meadows East. Meadows East was not, however, obligated to pay the charge or fee solely from the loan proceeds. The building loan agreement was not entered into until Mason-McDuffie had received the commitment for insurance of advances from FHA and the purchase commitment from GNMA. Again, the charge or fee represented 2 percent of the face amount of the loan; the amount is governed by section 221.508 of the FHA regulations.

On December 5, 1972, Meadows East executed and the Federal Housing Commissioner endorsed (the "initial endorsement") a promissory note payable to the order of Mason-McDuffie in the principal amount of $3,142,300, together with a deed of trust on the apartment project to secure the payment of the promissory note. The note, as originally executed by Meadows East to Mason-McDuffie, or order, was for a term of 41½ years at an interest rate of 7 percent per annum. The note called for "interest only" payments for approximately 1½ years (until March 1, 1974), and installment payments of principal and interest for the remaining 40 years.

Facts relating to "payment" of the initial service charge or financing fee are as follows:

(1) Meadows East opened a general checking account with Valley Bank of Nevada, Reno, Nev., on June 21, 1972, with an initial deposit of $150,000, representing the capital contribution of one of the limited partners. Between June 21, 1972, and December 5, 1972, disbursements were made from the general account reducing the balance of the account to $1,873 as of the close of business on December 5, 1972. One of the disbursements was a payment of $148,114 that cleared the bank account on June 23, 1972. The purpose of this disbursement was to discharge an encumbrance on the land on which the apartments were to be constructed.

(2) Pursuant to a "Request for Payment" submitted by Meadows East, on December 4, 1972, Mason-McDuffie applied to FHA for insurance for the contemplated advance, and FHA (on December 5, 1972) approved and certified the mortgage insurance, stating that the entire amount (including the $62,846) when advanced would "thereupon constitute principal" of the previously executed mortgage. Mason-McDuffie certified to the

FHA that the $62,846 "initial service charge" had "been collected in cash or will be so collected not later than the date of the initial endorsement." (The date of the initial endorsement was also December 5, 1972.)

(3) On December 6, 1972, $311,061.24, representing a portion of the first payment on the loan from Mason-McDuffie, was deposited in Meadows East's checking account at Valley Bank of Nevada. The $311,061.24 loan advance was made pursuant to a formal "Request for Payment" submitted by Meadows East that itemized the payments requested. The itemization included the $62,846 charge or fee here in question. Although Meadows East was contractually obligated to pay the $62,846 to Mason-McDuffie, Meadows East obtained unrestricted physical control over the loan advance at the time it was deposited in the Valley Bank of Nevada account. Mason-McDuffie was not a signatory to the bank account. If Meadows East had not paid the $62,846 to Mason-McDuffie, it would have been in default under the terms of the loan, and Mason-McDuffie would not have continued to advance funds for the construction project.

(4) On December 6, 1972, Meadows East issued a check on its general account payable to the order of Mason-McDuffie Investment Co. of Nevada in the amount of $62,846, representing payment of the 2-percent charge or fee.

(5) The check cleared the general account on December 14, 1972. The balance of the general account at the opening of business on December 6, 1972, prior to the deposit of $311,061.24, was, according to bank records, $1,873. The balance of the general account immediately before the $62,846 check cleared the account on December 14, 1972, was, according to the bank records, $68,381.97. There were no additional deposits made to the general account between December 6, 1972, and December 14, 1972.

The 2-percent fee of $62,846 was deducted by Meadows East partnership on its 1972 Federal income tax return as interest expense.

Construction of the 200-unit apartment complex commenced in December 1972, and was completed in June 1974.

The promissory note here involved was endorsed (the "final endorsement") for insurance by the Federal Housing Commissioner on January 13, 1975.

On January 29, 1975, GNMA purchased the promissory note in

accordance with the terms of its 1972 commitment for 100 percent of the unpaid principal balance and accrued interest, less purchasing and marketing fees of one-half percent of the unpaid principal balance. The purchasing and marketing fees were paid by the limited partnership.

### Additional Facts

The procedures followed and services performed by the various entities were essentially the same for both the Willowbrook Apartments and the Meadows East projects.

The 2 percent required to be paid by each partnership to Mason-McDuffie Investment Co. of Nevada pursuant to the building loan agreements is described interchangeably in various FHA publications, regulations, documents, and forms as an "initial service charge" or "financing fee." The fee represents 2 percent of the face amount of the loan, and is limited by FHA regulations.

When the building loan agreements here involved were entered into (November 24, 1971, and December 5, 1972, respectively) the payment of the maximum allowable 2-percent "initial service charge" or "financing fee" was customary in FHA housing projects. However, a later adoption by the FHA of an increase in the maximum interest rate on construction financing (to 9 percent) has resulted in a practice whereby the mortgage banker frequently takes less than the 2-percent allowance.

In addition to the payment of the 2-percent charge or fee to Mason-McDuffie and the GNMA commitment fee, each partnership paid, during the calendar year at issue, inspection and examination fees to FHA, legal and organizational fees to the general partner, and mortgage insurance premiums to FHA.

The maximum interest rate permitted to be imposed on promissory notes or mortgages insured by FHA under sections 221(d)(4) and 236 of the National Housing Act is limited by FHA regulations. The maximum rate permitted by FHA regulations (sections 221.518 and 236.15) during the years in question (1971 and 1972) was 7 percent, the same amount charged on both loans here in issue. The maximum rate allowed by FHA is generally lower than the prevailing market rate for private borrowers to borrow from mortgage bankers.

In the Willowbrook Apartments and the Meadows East

projects, Joseph F. McDonald was the general partner, the attorney for the partnerships, the "sponsor" of the FHA applications, the developer, and the owner of the construction company that constructed the apartment buildings. He was very experienced in FHA projects, and Mason-McDuffie had worked with him on numerous projects. Because of his expertise, McDonald prepared virtually all the FHA applications, income and expense projections, and legal documents in connection with the projects. As consideration for the services performed by McDonald, he was paid attorney's fees, organizational fees, and developer's fees.

Mason-McDuffie, the private lender, performed the following services in connection with the loans for the two projects:

(a) Reviewed, approved, and signed the various applications and projections submitted to FHA.

(b) Reviewed and executed the various loan documents.

(c) Applied for and obtained the GNMA purchase commitments.

(d) Attended the "initial closing."

(e) Processed the progress payment applications during the course of construction and disbursed the construction loan proceeds.

(f) Reviewed the various documentation required for the "final closing."

(g) Attended the "final closing."

In consideration for loaning the money and performing these services, Mason-McDuffie was paid the 2-percent "initial service charge" or "financing fee," together with 7-percent interest on the amounts disbursed prior to the purchase of the loans by GNMA or FNMA.

All other customary loan costs, such as escrow fees, title insurance premiums, appraisal fees, inspection fees, mortgage insurance premiums, legal fees for the preparation of the documents, recording fees, and accounting fees were paid by the partnerships.

The private lender in an FNMA participation program performs services similar to those rendered by private lenders in the subject section 221(d)(4) and section 236 projects. In an FNMA participation program, FNMA participates in up to 95 percent of the construction loan but performs none of the services in connection with the loan. The private lender

participates in 5 percent or more of the loan and performs all the services. Under that program, the initial service charge allowed by FHA is divided between the private lender and FNMA. In general, the private lender is entitled to the greater of (a) $7,500 or (b) 2 percent of its share of the loan and one-half percent on FNMA's share. FNMA retains 1½ percent of its share of the loan.

## ULTIMATE FINDINGS OF FACT

Part of the "initial service charges," $55,026 paid by Willowbrook Apartments and $55,346 paid by Meadows East, was compensation for the use of money, or interest. These amounts were "paid" by the partnerships in the taxable years in issue.

The balance of the "initial service charges" paid by each of the borrowers, or $7,500, was compensation for services rendered.

## OPINION

A variety of fees are involved in a low-income housing project financed by a mortgage guaranteed by the FHA. The treatment of all but one item here has been disposed of by settlement. Still in issue is the deductibility of the 2-percent "initial service charges" or "financing fees." The fee charged to Willowbrook Apartments partnership was $62,526. The fee charged to the Meadows East partnership was $62,846. Issues raised by these charges or fees are: (1) What portion of the fees, if any, represents "interest" under section 163(a)? (2) To the extent the amounts constitute interest, were they "paid" in the taxable years in issue?[3] (3) If a part of the fees was paid for services, over what period of time should such payments be amortized?

Initially, respondent contends that no portion of the 2-percent charge or fee can be deducted as interest because it is not authorized as such under FHA regulations. The partnerships were formed to build and operate FHA-insured housing projects under authority of the National Housing Act and regulations thereunder. In connection with obtaining loans for the projects, the partnerships agreed to pay "initial service charges" to the lender-mortgagee, Mason-McDuffie, which charges were permitted by FHA regulations "to reimburse the mortgagee for the

---

[3] As part of the agreement to settle other issues, respondent agreed a deduction for interest paid during the years in issue would not be disallowed under sec. 446(b) (distortion of income).

cost of closing the transaction." Another FHA regulation provided that the maximum interest rate on the loans in question was to be 7 percent, which was the stated interest rate for these loans. Accordingly, respondent urges, under the FHA regulations the 2-percent charge or fee could not be interest.

Petitioners submit, however, that the lender's operating costs are irrelevant to the characterization of the charge or fee as interest. In general, they argue that the amounts paid under the building loan agreements can only represent interest or services, that the value of the lender's services was significantly lower than the "initial service charges," and therefore the balance must be interest.

The governing law may be stated simply. Under section 163(a) a deduction is allowed for all interest paid or accrued within the taxable year on indebtedness. "Interest" is defined as "compensation paid for the use or forebearance of money." *Deputy v. du Pont*, 308 U.S. 488 (1940).

What constitutes compensation paid for the use or forebearance of money is controlled by the facts, not terminology. *L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894, 897 (1957). Ample authority can be found to show that the status of an item as interest for Federal income tax purposes does not depend upon its classification for other purposes. Perhaps the classic illustration is *Wiggin Terminals, Inc. v. United States*, 36 F.2d 893 (1st Cir. 1929), where, to avoid usury laws, the taxpayer borrowed money under an agreement to pay 6-percent interest and a bonus. Though the bonus for the loan could not be enforced under State law, it was held deductible as interest for Federal income tax purposes. See also Rev. Rul. 69–189, 1969–1 C.B. 55 (where State law sets maximum loan charge, Commissioner says lender's statement that entire amount is interest is not sufficient if facts show portion attributable to services). What the Federal Housing Administration calls the charge or fee, therefore, is not determinative here. Moreover, as already noted in our findings, the 2-percent item is described interchangeably as an "initial service charge" or "financing fee" in FHA publications, regulations, documents, and forms. Consequently, our sole concern is whether in fact the charge or fee represents compensation for the use or forebearance of money.

At the trial petitioners offered the testimony of Donald L.

Wilkerson and H. James Griggs to support their claim that substantially all the 2-percent charge or fee was interest.

Donald L. Wilkerson, vice president of Mason-McDuffie and a petitioner in this case, testified that the following were the only services performed by Mason-McDuffie:

(1) Consultations with Joseph F. McDonald, the general partner in both partnerships, and with various FHA officials regarding the loans.

(2) Reviewing and signing various FHA forms required to obtain the FHA mortgage insurance commitment. (The forms were prepared by Joseph F. McDonald.)

(3) Applying for the GNMA/FNMA loan purchase commitments.

(4) Reviewing loan documents.

(5) Attending the "initial closing."

(6) Processing the progress payment applications and disbursing the construction loan proceeds.

(7) Reviewing documents required at and attending the "final closing."

Substantially all the services performed in obtaining the FHA mortgage insurance commitments and in preparing the loan application forms and loan documents were performed by Joseph F. McDonald, the general partner of both partnerships. For these services, McDonald was paid legal and organizational fees. These fees were paid by the partnerships and were not part of the 2-percent charge or fee in issue.

According to Wilkerson, the value of the services performed by Mason-McDuffie was about $5,000 for each loan.

H. James Griggs, a mortgage banker for some 20 years and most recently a consultant for banks, mortgage bankers, GNMA, and the Department of Housing and Urban Development, testified as petitioners' expert witness. Griggs had been involved in about 600 multifamily housing projects insured by FHA. In general, about half of these were section 221(d)(4) projects and the other half section 236 projects. His testimony appeared unbiased and was most instructive.

According to Griggs, the services performed by the mortgage banker (here Mason-McDuffie) vary depending upon the expertise of the sponsor (here the partnerships) and the other parties involved. The mortgage banker coordinates the activities of the sponsor's attorney, architect, CPA, contractor, and other parties.

Griggs testified that the mortgage banker's basic charges include the stated interest rate and the initial service charge or financing fee. Also, it can charge the appropriate commitment fees, purchase and marketing fees, and discounts owned FNMA or GNMA for issuing the take-out commitment, which amounts would be paid by the borrower through the mortgage banker.

Griggs further testified that the portion of the maximum allowable 2-percent initial service charge or financing fee actually charged by the mortgage banker is a negotiated item dependent upon his interest yield requirements. When the loans in issue were made, the charge or fee provided a cushion for the mortgage banker in the event he had to pay as much in interest for funds advanced as he collects from the sponsor-borrower. With the later change in FHA regulations allowing 9-percent stated interest during the construction period, the mortgage banker frequently takes less than the 2-percent initial service charge or financing fee.

In short, Griggs testified that the initial service charge or finance fee was in part interest and in part payment for services. The amount attributable to each element will vary with the state of the money market and also with the share of the work performed by the mortgage banker. It is not unusual, Griggs noted, for a sponsor-borrower with expertise to do most of the work himself.

Finally, Griggs estimated the actual service element of the 2-percent charge or fee in these loans to be within a range of $5,000 to $10,000. The balance would represent interest. Along with his general knowledge of the industry, Griggs supported his estimates by referring to the $7,500 minimum fee the private lender is entitled to for performing similar services in an FNMA participation program. In such a program, FNMA participates in up to 95 percent of the construction loan but performs none of the services in connection with the loan. The private lender participates in 5 percent or more of the loan and performs all services. The initial service charge allowed by FHA generally is divided between the private lender and FNMA as follows: The private lender gets the greater of (a) $7,500 or (b) 2 percent of its share of the loan and one-half percent on FNMA's share. FNMA retains 1½ percent of its share of the loan.

We are convinced by the testimony of petitioners' witnesses, particularly Griggs' testimony, that only a small part of the

initial service charges or financing fees was attributable to services. Joseph F. McDonald, the general partner of the partnerships, performed so many of the services connected with the construction loans that Mason-McDuffie's services were not substantial. Moreover, items more clearly recognized as service charge items, such as inspection fees, escrow fees, appraisal fees, title insurance premiums, and accounting fees were paid separately by the partnership. Whatever its label, the 2-percent charge or fee is recognized by the industry as compensation for the use or forebearance of money. This is supported by the fact that the prevailing money market affects the amount of the fee actually charged. Understandably, a mortgage banker would not provide financing at 7 percent if that were not competitive in the money markets. Taking all this and the entire record into consideration, we find that the value of the services rendered by Mason-McDuffie in connection with each project was $7,500. The balance of the 2-percent fees charged the partnerships (Willowbrook Apartments, $55,026; Meadows East, $55,346) represents compensation for the use or forebearance of money, that is, interest.

A charge of approximately $62,000 for the services the evidence indicates were actually rendered by Mason-McDuffie on these two loans is unreasonable. But it is not unreasonable to believe that Mason-McDuffie would want a cushion over and above the 7-percent straight interest rate it was entitled to charge by the FHA for the use of the money during the construction period and that the partnerships were willing to pay for use of the money. We believe all parties to these transactions recognized that a sizeable portion of these fees was for the use of money. While respondent's arguments focusing on the lender's costs appear to deal with the wrong party so far as the borrowers are concerned, what evidence we have on Mason-McDuffie's costs indicates they were far less than $62,000.

In *Lay v. Commissioner*, 69 T.C. 421 (1977), we held that the 2-percent finance fees paid to the mortgage bankers who initiated the loans were brokerage and commission fees and not interest. But in that case we emphasized that the mortgage bankers did not lend any of their own money, even during the construction period, and the fees they received could not be characterized as interest. They immediately assigned their interests to the permanent lenders who put up the money used for construction

and other costs. The only thing supplied by the mortgage bankers was services, so the fees had to be for services. Here Mason-McDuffie supplied the money used during the construction period and was entitled to interest for the use of that money.[4]

The next issue is whether the amounts we have determined to be interest were "paid" during the taxable years in issue. For cash basis taxpayers, section 163(a) generally permits the deduction only for interest "paid" within the taxable year. Our inquiry is limited to the payment question because respondent has not argued any deferral limitations under the tax accounting provisions, see section 446(b) and section 1.461–1(a), Income Tax Regs. Moreover, section 461(g), which provides specific limitations on the deductibility of prepaid interest, does not apply to payment in these years. Sec. 208(b), Tax Reform Act of 1976, Pub. L. 94–455.

The payment required to secure a deduction for a cash basis taxpayer is the payment of cash or its equivalent, and the giving of the taxpayer's note is not the equivalent of cash. *Helvering v. Price*, 309 U.S. 409 (1940). Similarly, interest withheld by a lender from loan proceeds is not fully deductible in the year the interest is withheld, but rather is deductible only as principal payments are made. *Cleaver v. Commissioner*, 6 T.C. 452 (1946)(reviewed by the Court), affd. 158 F.2d 342 (7th Cir. 1946), cert. denied 330 U.S. 849 (1947). The theory is that giving a promissory note and having interest withheld from the loan proceeds (that is, "discounting" the loan) are indistinguishable.

In response to the argument that a discounted loan is no different than if the lender had credited the taxpayer's bank account and the taxpayer had withdrawn funds from this amount to pay the interest, in *Rubnitz v. Commissioner*, 67 T.C. 621 (1977), we said:

However, even if the loan transaction had been so structured—and it was not—Branham would not necessarily be treated as having "paid" the loan fee. For the critical point which appears from the record before us is that Branham never had unrestricted control over any portion of the loan proceeds, much less over the entire $1,650,000. Its powers in respect of these funds were at all times

---

[4]In *Trivett v. Commissioner*, T. C. Memo. 1977–161, we also held that initial service fees required to be paid by the borrower to mortgage bankers on FHA loans were not deductible as interest. However, this conclusion was based on the fact that petitioner failed to carry his burden of proving that the fees were an additional cost of borrowed money. We find that petitioners in this case have carried their burden of proof.

subject to substantial limitations. Under such conditions, a prearranged retransfer of funds, immediately after they had been deposited in Branham's account, as the final step in an integrated transaction would not constitute the "payment" which gives rise to a deduction by a cash basis taxpayer. *Thomas Watson*, 8 T.C. 569, 579; *T. Harvey Ferris*, 38 B.T.A. 312, 317, affirmed per curiam 102 F.2d 985 (2d Cir.). Cf. *Newton A. Burgess*, 8 T.C. 47, 50. Moreover, there is no evidence that Branham had sufficient assets—apart from the loan proceeds—from which it could have paid the loan fee in full. Cf. *G. Douglas Burck*, 63 T.C. 556, 559–560, affirmed 533 F.2d 768 (2d Cir.). [67 T.C. at 629.]

In *Watson* and *Ferris*, the authorities cited in *Rubnitz* as direct support, the taxpayers maintained their bank accounts at the same banks from which the loans were obtained. The banks merely credited the loan proceeds to the taxpayers' accounts and immediately charged the accounts for the amounts at issue. Therefore, even though the loan proceeds were first credited to the accounts, the lenders retained control over the proceeds by virtue of the accounts being maintained with the lenders.

In contrast, a check is treated as conditional payment with the time of payment relating back to the time of delivery provided the check is honored by the drawee bank when presented. *Estate of Spiegel v. Commissioner*, 12 T.C. 524 (1949). Also, interest paid by a cash basis taxpayer with borrowed funds is deductible when the interest is paid. It is not deductible in the later year when the loan is repaid. *Perry v. Commissioner*, 28 B.T.A. 497 (1933).

Respondent argues that the partnerships never had "unrestricted control" over the loan proceeds used to pay the 2-percent fees and that the "prearranged retransfer of funds" should be regarded the same as a discounted loan under *Rubnitz v. Commissioner, supra*.

We have rejected that same argument where the lender gave up control of the borrowed funds, the funds were commingled with the taxpayer's own funds, and then the commingled funds were used to prepay interest. *Burgess v. Commissioner*, 8 T.C. 47 (1947); *Burck v. Commissioner*, 63 T.C. 556 (1975), affd. 533 F.2d 768 (2d Cir. 1976).

In *Burgess* the cash basis taxpayer borrowed amounts from a collateral note dealer totaling $203,988.90. Interest on this amount, to be prepaid, totaled $4,136.44. Just prior to the due date of the interest, the taxpayer borrowed an additional $4,000 from the same creditor. The sum was deposited in his checking account at a bank where it was commingled with other funds. Shortly thereafter the taxpayer drew a check on this account in

the amount of $4,219.33 to cover the $4,136.44 interest due plus $82.89 prepaid interest on the $4,000 loan. On the day the check was drawn, not counting the $4,000 borrowed, the petitioner had only $3,180.79 in his checking account. The taxpayer did not borrow the $4,000 solely to pay the advance interest due. Other bills became due, and the taxpayer needed sufficient funds to pay them. The Commissioner contended that the cash basis taxpayer had in effect merely substituted a note in place of the interest payable, and disallowed the interest deduction. In a Court-reviewed opinion we disagreed since the identity of the borrowed funds was lost in the taxpayer's checking account. *Cleaver v. Commissioner, supra,* the discounted loan situation, was distinguished because there the interest never went through the borrower's hands and never passed through his bank account. Consequently, the interest payment in *Burgess* was properly deductible.

In *Burck* the cash basis taxpayer borrowed $5,388,600 in December 1969 from a bank. One million dollars of the loan proceeds was deposited in the taxpayer's account at a second bank. The $1 million was commingled with an already existing balance of $42,009.02 in the account. One day after the deposit to the bank account, and pursuant to the loan agreement, the taxpayer paid $377,202 from the commingled funds to the lender, representing 1 year's interest on the loans. Again, the Commissioner argued that the transaction in substance was a discounted loan. We concluded the facts were within the scope of *Burgess* and held that section 163 would permit an interest-expense deduction. This was so even though the prepayment of interest was an integral part of the loan agreement, and the bank would not have proceeded with the loan agreement were it not for the prepayment of interest. However, we also held that the Commissioner, did not abuse his discretion under section 446(b) in requiring the taxpayer to defer deduction of the interest allocable to a later year. That provision is not in issue here. See n. 3 *supra.*[5]

The *Burgess* and *Burck* cases are not meaningfully distinguishable from the facts before us. Although a large portion of the 2-percent fees was derived from the loan proceeds, the loan

---

[5]See also sec. 461(g), added by Pub. L. 94–455, sec. 208 (Tax Reform Act of 1976).

proceeds were first deposited into the bank accounts of the partnerships. When the loan proceeds were deposited, the lender lost control of the proceeds, the proceeds were commingled with the partnership funds and lost their identity. Respondent's reliance on *Rubnitz* is misplaced because here, unlike the hypothetical discussed in *Rubnitz*, the borrowed funds were not deposited in accounts maintained with the lender. Here, unlike the *Rubnitz* hypothetical, the partnerships obtained unrestricted control over the loan proceeds.

Respondent also urges that the *Burgess* and *Burck* opinions do not embrace the situations here on the ground the borrowed funds were not sufficiently commingled with the partnerships' other funds. (The balance of the Willowbrook Apartments' checking account, prior to deposit of the loan proceeds and before the check for the 2-percent fee was drawn, was $2. However, $45,000 in capital contributions of some limited partners was deposited 2 days before the check cleared the account. The balance of the Meadows East checking account, prior to deposit of the loan proceeds and before the check for the 2-percent fee was drawn, was $1,873.) We resist respondent's attempt to confine *Burgess* and *Burck* so narrowly. Interest may be paid with borrowed funds, see *Perry v. Commissioner, supra,* and if they are borrowed from the same lender who provides the principal, the entire transaction may constitute a discounted loan. However, the point in *Burgess* and *Burck* is that section 163(a) imposes no general requirement to trace the source of funds used to pay interest. The partnerships here acquired control of the loan proceeds as evidenced by their deposit in the partnership checking accounts outside the lender's domain. That the partnerships exercised their control over the funds for only a brief period of time does not convert the transactions into discounted loans.

Finally, *Parks v. United States*, 434 F. Supp. 206 (N.D. Tex. 1977), cited by respondent, is not instructive. There, a similar "initial service charge," conceded by the Government to be interest, was held to be in substance merely withheld by the lender from the principal amount of the loan. The court indicated that the loan proceeds were disbursed to the borrowing partnership from the lending bank, and the partnership immediately paid the interest back to the bank. However, the court did not say whether the proceeds were deposited in the partnership's

bank account, or whether any such bank account was with the lending institution. *Rubnitz* is cited without discussion of *Burgess* or *Burck*. As so limited, the opinion offers us little guidance.

We conclude the amounts we have determined to be interest were paid by the partnerships in the taxable years in issue. The interest so paid is properly deductible by the partnerships in those years.

The final issue is when the portion of the "initial service charges" actually attributable to services, $7,500 for each partnership, is deductible.

Under the same analysis as above regarding the interest element, the actual service element must be considered paid during the years in issue. However, the parties agree that deductions for the amounts attributable to services must be deferred over the life of the loans. See sec. 1.461–1(a), Income Tax Regs. They disagree over whether the loans should be viewed as separable construction and permanent loans or as single package loans, and thus, over what periods the amounts attributable to services should be amortized.

Petitioners ask us to overlook the actual term of the notes (approximately 42 years) evidencing the loans made by Mason-McDuffie to the partnerships because the customary practice in the industry is that FNMA or GNMA purchases the note after the construction is completed. The effect of this practice, petitioners argue, is that Mason-McDuffie should be considered as making only construction loans, and the purchase of the notes by GNMA/FNMA should be regarded as separate, permanent loans. On this theory, amounts paid for Mason-McDuffie's services in connection with the functions normally performed by a construction lender should be amortized over the brief period of the "construction loan."[6]

Again, we believe the proper focus of analysis must be on the partnerships as borrowers. For services rendered by Mason-McDuffie, they received permanent financing over a period of

---

[6]The amount in controversy actually is only half of each $7,500 amount because petitioners concede that half of Mason-McDuffie's services were in connection with obtaining the FHA mortgage insurance commitment, which relates to the approximately 42-year term of the notes. They claim the other half of Mason-McDuffie's services relate solely to the functions normally performed by a construction lender in connection with a construction loan and should be amortized over approximately a 2½-year period. Our determination that the loans are not separable moots this allocation.

approximately 42 years. FNMA and GNMA in purchasing the partnerships' notes held by Mason-McDuffie do not become new lenders. The partnership-borrowers continue to pay principal and interest payments under the terms of the original notes.

In any event, Mason-McDuffie was not obligated to sell the notes to FNMA or GNMA. Mason-McDuffie could keep the notes for their entire terms (or a portion thereof), or it could sell the notes to an independent third party. Indeed, as petitioners point out, the single set of loan documents insures the marketability of the loans.

A similar construction/permanent loan argument was rejected in *Lay v. Commissioner, supra*. We recognize that in *Lay* the facts were somewhat different from the facts we have because in that case the mortgage bankers did not provide the construction money but immediately assigned the loans to the permanent lenders who supplied the funds to the partnerships. Nevertheless, our response to this argument in the *Lay* case is equally apposite here and dictates our conclusion on this issue. We said:

each partnership negotiated a single loan secured by a 40-year mortgage. The fact that the mortgage note could later be sold by the holder on the secondary mortgage market has no bearing on the disposition of the first transaction except as to who is the ultimate receiver of payments owed. Notwithstanding the transfer of the note here, the original loan terms remain unchanged. Petitioner is bound by the provisions of each original loan document terms extending the time period for repayment of each mortgage, here 40 years; terms governing the rate of interest, here 8½ percent on the unpaid balance; and terms securing the property to be used as collateral, here the deed of trusts and the deed of trust notes for each project. Because the mortgage was not altered and because no other mortgage was directly executed between the partnerships (here the original mortgagors) and any secondary mortgagees, the 40-year duration of each loan is subject to the amortization period.

\*      \*      \*      \*      \*      \*      \*

Petitioner contends that interest paid during any year of a loan theoretically may benefit any other year as well, so that an accrual method taxpayer's payment of "points" or loan "discount" is not the prepayment of interest that rightfully accrues in a subsequent year. This reasoning begs the question. Regardless of the number of loans, the payments were essential to secure the financing needed for each project. It is a logical extension of this premise that the period benefited as a result of these fees is not confined to the year of payment. This is because the fees were for the purpose of obtaining long-term financing for each project; therefore, the entire financing period has profited. [69 T.C. at 435–436; fn. ref. omitted.]

We hold therefore that the $7,500 of each "initial service

charge" actually paid for services must be amortized over the permanent financing period.[7]

*Decisions will be entered under Rule 155.*

---

[7]See also *Trivett v. Commissioner, supra:* "We think they [the fees for services] are more like payments for services rendered in obtaining permanent financing for the project."