ALAN A. RUBNITZ, RIVA M. RUBNITZ; ROBERT R. KRANDEL, RUTH E. KRANDEL; LELON C. WICHERT, KATHY E. WICHERT; ROY S. AAL, SYRILL AAL; FRANK E. RITCHEY, JR., BETTY R. RITCHEY; MARCO GOODMAN, RUTH M. GOODMAN; SYLVAN GROSS, JACQUELINE GROSS; WILLARD B. ROSS, MARIA ELENA ROSS; AND ASHLAND INVESTMENT CO., INC., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4313-74.   Filed January 6, 1977.

*David R. Sylva,* for the petitioners.
*Warren N. Nemiroff,* for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' income taxes as follows:

| Petitioners | Year | Deficiencies |
|---|---|---|
| Alan A. Rubnitz and Riva M. Rubnitz.. | 1970 | $635.00 |
| Robert R. Krandel and Ruth E. Krandel | 1970 | 1,039.00 |

| | | |
|---|---|---|
| Lelon C. Wichert and Kathy E. Wichert | 1970 | 717.00 |
| Roy S. Aal and Syrill Aal | 1970 | 4,766.00 |
| Frank E. Ritchey, Jr., and Betty R. Ritchey | 1970 | 4,428.00 |
| Marco Goodman and Ruth M. Goodman | 1970 | 2,417.00 |
| Sylvan Gross and Jacqueline Gross | 1970 | 1,424.50 |
| Willard B. Ross and Maria Elena Ross | 1970 | 1,528.52 |
| Ashland Investment Co., Inc. | Sept. 30, 1971 | 1,021.98 |

The principal issue is whether a deduction is allowable in 1970 in the computation of petitioners' distributive shares of partnership income for a "fee" charged by a bank in connection with a construction loan made to the partnership.[1]

## FINDINGS OF FACT

The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference.

The individual petitioners are the following married couples: Alan A. and Riva M. Rubnitz; Robert R. and Ruth E. Krandel; Lelon C. and Kathy E. Wichert; Roy S. and Syrill Aal; Frank E. Ritchey, Jr., and Betty R. Ritchey; Marco and Ruth M. Goodman; Sylvan and Jacqueline Gross; and Willard B. and Maria Elena Ross. Each couple filed a joint return for 1970, and all of them resided in California at the time of the filing of the petition herein. The corporate petitioner, Ashland Investment Co., Inc., had its principal place of business in San Leandro, Calif., at the time of the filing of the petition herein. It filed a corporate income tax return for its fiscal year ended September 30, 1971.

All petitioners were partners in Branham Associates (Branham), a limited partnership formed in 1970. Petitioner Alan A. Rubnitz (Rubnitz) was the organizer and general partner of Branham.

Branham was organized to construct and operate an apartment complex in San Jose, Calif. For this purpose, the partnership sought to borrow money from various financial institutions. During October 1970, Rubnitz, acting on behalf of

---

[1] If this fee is not deductible, then by virtue of the resulting increase in petitioners' respective incomes, the allowable medical expense deductions claimed by some petitioners will also be reduced.

the partnership, made arrangements to obtain financing for the project from Great Western Savings & Loan Association (Great Western). The general terms of a loan were agreed upon orally at that time; it was expected that formal documents closing the transaction would be executed approximately 60 days thereafter. The parties have stipulated that the financing thus arranged was a "25 year, $1,650,000.00 construction loan."[2]

In addition to interest charged at an annual rate over the term of the loan, Branham agreed to pay upon the closing of escrow on the loan a "loan fee" of 3½ percent of the principal amount of the loan. This loan fee amounted to $57,750.

During early December 1970, Great Western agreed to several changes in the terms of the loan. These changes included a reduction in the interest rate to be charged and also an extension—until December 31, 1970—of the deadline for closing the loan. Great Western's loan committee approved these changes—

subject to: 1% non-refundable commitment fee being collected at this time. To be credited to the loan fee when the loan is recorded.

Great Western required this 1-percent fee from Branham to insure that the partnership would proceed to close the loan. Great Western's assent to the changes in the terms of the loan, and its decision to require Branham to tender this 1-percent fee, were communicated to Rubnitz by a letter dated December 7, 1970, which stated in part:

4. A one per cent (1%) standby fee to be placed with this Association. This fee to be credited toward the total fee charged upon closing of escrow.

By a check in the amount of $16,500, dated December 15, 1970, Branham tendered the 1-percent fee to Great Western. By an internal transmittal order dated December 15, 1970, Great Western placed this $16,500 in a "suspense account" subject to the following instruction: "This amount [is] to be refunded from suspense account when escrow closes."

---

[2] This loan is referred to as a "construction loan" both in the stipulation of facts and in the loan documents themselves. However, it appears that the loan should more properly be characterized as a "combination construction take out loan," since it involved both a construction loan and permanent financing. For convenience it will hereinafter sometimes be referred to as a "construction loan" in accordance with the terminology used by the parties.

On December 17, 1970, escrow closed on the loan in question; however, no funds were actually disbursed to Branham at that time. Rather the loan proceeds were made available to the partnership only in accordance with the Building Loan Agreement and Assignment of Account No. 76–09117, which provided in part as follows:

> The net proceeds[3] of this loan * * * are to be placed on deposit with [Great Western] * * * in a special non-interest-bearing account entitled "LOANS IN PROCESS ___BRANHAM ASSOCIATES, a limited partnership___ BUILDING LOAN ACCOUNT," * * * Subject to the provisions of this agreement, the undersigned * * * hereby irrevocably assign to [Great Western], as security * * * title * * * to said account and all monies to be placed therein * * *. The undersigned acknowledge that they * * * have no right to the monies in said account other than to have the same disbursed by [Great Western] in accordance with this agreement * * *

The agreement further provided that funds were to be disbursed from the account from time to time upon presentation of vouchers in respect of costs incurred in the course of construction. No vouchers were submitted nor were any of the loan proceeds paid out during 1970.

Although the principal amount of the loan was $1,650,000, only $1,592,220 was actually "deposited" in Branham's "Loans in Process" account. Most of the $57,780 difference between the $1,650,000 and $1,592,220 figures resulted from the 3½-percent loan fee which Great Western charged Branham. Great Western "deducted" this loan fee from principal of the loan. The rest of the difference, resulted from a "Tax Service Fee" of $20, and from a "Credit Report Fee" of $10, both of which Great Western also "deducted" from the loan principal.[4]

Before he executed the documents to close the loan, Rubnitz noticed that the $16,500 "standby" or "commitment" fee which Branham had "paid" by its check dated December 15, 1970, had not been credited towards the 3½-percent loan fee. He nevertheless decided to execute the documents as they had

---

[3] The agreement provided that "the term 'net proceeds' is defined in the Borrower's Instructions executed in connection with this loan." These borrower's instructions were not made a part of the record of this case, nor does the record otherwise define the term "net proceeds." However, as indicated ¡above,\ the amount actually deposited in the construction loan account was $1,592,220.

[4] Petitioners have abandoned any claim that these smaller amounts were deductible expenses of the taxable year before us.

been prepared in order to avoid delaying the closing past December 31, 1970. At a time not clearly disclosed by the record, Rubnitz communicated with an official of Great Western who then promised to see that the $16,500 which Branham had deposited was refunded. The $16,500 remained in the "suspense account" through the end of 1970, until it was, by a check dated January 9, 1971, refunded to Branham.

Branham's obligation to repay the loan with interest was evidenced by a promissory note. The terms of this obligation were specified in the note as follows:

__$1,650,000.00__                                          __December 17, 1970__
  * * * I promise to pay to
GREAT WESTERN SAVINGS AND LOAN ASSOCIATION * * * the principal sum of __ONE MILLION SIX HUNDRED FIFTY THOUSAND AND NO/100------__ DOLLARS, with interest from the date hereof on the unpaid principal balance at the rate of __9.0%__ per annum; principal and interest payable in monthly installments of __THIRTEEN THOUSAND EIGHT HUNDRED SIXTY AND NO/100------__ dollars each, beginning on the __1st__ day of __March__ 1972, * * *. Each payment shall be credited first on interest then due and the remainder on principal; and interest thereupon ceases upon the principal so credited. Interest shall be paid __during the first 270 days, at 9.0% per annum only on amounts as drawn from the dates drawn; thereafter, at 9.0% per annum on the full amount of the note whether or not all funds have been drawn__ until the date monthly installments of principal and interest commence as above provided.

Branham did not repay any of the loan principal during 1970, nor did it pay any of the 9-percent annual interest in respect of the principal amount of the loan during that year.

Insofar as can be determined from the record, Great Western did not treat the $57,750 loan fee or the $30 in miscellaneous fees as "amounts drawn" within the meaning of the loan agreement. Moreover, there were no other amounts drawn from the construction loan account during 1970. And furthermore, at least during the first 270 days after the closing of the loan, Branham was to be billed at the *end* of each month for interest attributable to amounts drawn during the month. Consequently, Branham paid no interest during 1970 in respect of any "amounts drawn" from the construction loan account.

The Commissioner adjusted each petitioner's claimed distributive share of the ordinary partnership loss reported by

Branham Associates. The basis for this adjustment was the Commissioner's determination that:

[Branham's deduction] claimed for interest paid is disallowed to the extent which it includes a $55,780.00[5] loan fee attributed to a discounted loan, because it has not been established that the amount was paid, or that it constitutes an ordinary and necessary business expense of the current year and should not be ratably apportioned over the loan repayment period.

### OPINION

Branham Associates was organized to construct and operate an apartment complex in San Jose, Calif. Branham sought financing for this purpose and during the fall of 1970 arranged for a 25-year, $1,650,000 construction loan with Great Western Savings & Loan Association. In addition to interest payable at a specified rate over the term of the loan, Great Western charged Branham a "loan fee" of 3½ percent of the principal amount of the loan. This so-called loan fee of $57,750 was "payable" at the close of escrow—when the loan proceeds were made available to the borrower. Further, before it would process the final loan documents, Great Western required Branham to place with it a "one per cent (1%) standby fee * * * to be credited toward the total fee charged upon closing of escrow." In compliance with this requirement Branham gave its check dated December 15, 1970, in the amount of $16,500 to Great Western. But, in spite of the original understanding that the $16,500 would be credited against the total loan fee, Great Western "deducted," upon the closing of escrow, the full $57,750 from the loan principal. Therefore, only $1,592,220[6] was deposited in the "Loan in Process" account from which Branham could draw funds for use in construction. The $16,500 standby fee was returned to Branham in January 1971.

Section 163(a), I.R.C. 1954, allows a deduction for "all interest paid * * * within the taxable year." There is apparently no question that the loan fee charged in this case constituted interest within the meaning of the statute. *Deputy*

---

[5] Apparently, only $55,780 (rather than $57,780) had been claimed as a deduction on the partnership return. The reason for the difference remains unexplained.

[6] Additional charges of $30 were also "deducted," but as noted in our Findings of Fact, *supra*, p. 624 petitioners have abandoned any claim to a current deduction based on these charges.

*v. DuPont,* 308 U.S. 488; *L-R Heat Treating Co.,* 28 T.C. 894, 896–897; Rev. Rul. 69–582, 1969–2 C.B. 29; Rev. Rul. 69–188, 1969–1 C.B. 54; cf. Rev. Rul. 67–297, 1967–2 C.B. 87. The principal controversy centers on whether Branham, as a cash basis partnership, "paid" the loan fee during its taxable year 1970.[7] See sec. 1.461–1(a)(1), Income Tax Regs. We hold that neither Great Western's "deduction" of the $57,750 loan fee from the principal amount of the loan, nor Branham's tender of the $16,500 check which was initially placed in a "suspense account" and subsequently refunded, constituted payment of interest within the meaning of section 163(a).

We consider first the contention that Branham "paid" the loan fee when Great Western "deducted" the $57,750 from the principal amount of the loan. To the extent that the allowability of a deduction to a cash basis taxpayer depends upon his having *paid* an otherwise deductible expense during the taxable period in issue, the payment must have been made in cash or its equivalent. *Eckert v. Burnet,* 283 U.S. 140. Thus, in general, when a cash basis taxpayer liquidates an obligation by the execution and delivery of his promissory note, he does not thereby become entitled to a deduction for having paid that obligation. *Helvering v. Price,* 309 U.S. 409; 2 Mertens, Law of Federal Income Taxation, sec. 12.54, pp. 213–214 (1974 rev.). More specifically, a cash basis taxpayer who gives his promissory note in "payment" of his liability for interest, is not thereby entitled to a deduction for "interest paid" under section 163(a). *Hart v. Commissioner,* 54 F.2d 848, 851–852 (1st Cir.), affirming 21 B.T.A. 1001; *Nat Harrison Associates, Inc.,* 42 T.C. 601, 624–625; *James W. England,* 34 T.C. 617–621; *S.E. Thomason,* 33 B.T.A. 576 (overruling *John*

---

[7] Branham's partnership income tax return for its taxable year which included Dec. 17, 1970, was not introduced into evidence in this case. Moreover, potentially relevant information about Branham's computation of its income for that period was not otherwise made a part of the record herein. The parties have apparently assumed that Branham computed its partnership income by using the cash receipts and disbursements method of accounting and also that its taxable year was the calendar year. Accordingly, where necessary we shall act on the basis of these assumptions since they are not contradicted by evidence in the record before us. Cf. *Donald M. Perry,* 49 T.C. 508, 522 n. 11; *Stanley C. Warrick,* 20 B.T.A. 220, 221; sec. 1.442–1(b)(2)(i), Income Tax Regs. Of course, to the extent that the record is inadequate in this or any other respect, petitioners, upon whom the burden of proof rested, must bear the consequences of that inadequacy. *Welch v. Helvering,* 290 U.S. 111; Rule 142(a), Tax Court Rules of Practice and Procedure.

*C. Hermann,* 27 B.T.A. 409); *Utah Orpheum Co.,* 3 B.T.A. 1041; cf. *Goodstein v. Commissioner,* 267 F.2d 127, 131 (1st Cir.), affirming 30 T.C. 1178, 1191. And, in cases which we view as fundamentally indistinguishable from the one now before us, it has been consistently held that a cash basis borrower has not paid interest when the loan transaction is structured so that a loan fee is "withheld" by the lender from what is called the principal amount of the loan and only the supposed principal amount minus the loan fee is actually made available for the borrowing taxpayer's use. *J. W. Solof,* 1 B.T.A. 776, 783; *A. O'Day,* 20 B.T.A. 455, 458; *John C. Cleaver,* 6 T.C. 452, affirmed 158 F.2d 342 (7th Cir.), certiorari denied 330 U.S. 849; *John Randolph Hopkins,* 15 T.C. 160, 180–181; *Sanford Campbell,* T.C. Memo. 1970–126, 29 T.C.M. 539, 1970 P-H Memo. T.C. par. 70,126; Rev. Rul. 75–12, 1975–1 C.B. 62; Rev. Rul. 59–260, 1959–2 C.B. 137.

That in substance is what happened here. Branham received $1,592,220 from the bank but it promised to repay $1,650,000 plus interest at a specified rate. Of the difference between these figures, $57,750 might well have represented additional interest charges. However, it is plain that Branham did not pay that interest in 1970. Instead, by signing a promissory note, it specifically chose to postpone paying that amount until sometime in the future. The entire $57,780 was to be paid ratably by the borrower over the life of the loan as one component of the monthly installments (beginning March 1, 1972) which would ultimately result in the payment of the full $1,650,000. Therefore, Branham may not deduct the $57,750 as "interest paid" during 1970.[8]

---

[8] Even if Branham were on the accrual rather than the cash basis, it would seem that if the $57,750 actually represented interest, liability for the payment of that amount did not accrue during 1970. The $57,750 was comprehended within the "principal" amount of a $1,650,000 promissory note which Branham was obligated to pay in monthly installments beginning Mar. 1, 1972. Only as each such installment became due did the aliquot portion thereof relating to the $57,750 component accrue. *James Brothers Coal Co.,* 41 T.C. 917, 921–922; *Higginbotham-Bailey-Logan Co.,* 8 B.T.A. 566, 577; Rev. Rul. 74–395, 1974–2 C.B. 45, 46; cf. Rev. Rul. 74–607, 1974–2 C.B. 149, 150.

In view of the result reached here we do not consider a possible alternative basis for disallowing the claimed deduction, namely, that even if the fee had been paid in 1970, it related to a 25-year loan, and therefore, deduction of the entire amount in 1 year might result in an impermissible distortion of income. Compare *Andrew A. Sandor,* 62 T.C. 469, affirmed 536 F.2d 874 (9th Cir.), *James V. Cole,* 64 T.C. 1091, and *Julia Stow Lovejoy,* 18 B.T.A. 1179, with *S. Rex Lewis,* 65 T.C. 625, 629–630, and Rev. Rul. 69–582, 1969–2 C.B. 29.

Petitioner's argument to the contrary is unpersuasive. Petitioner suggests that the substance of what occurred in this case was no different from the bank's initially having deposited the full $1,650,000 in Branham's account and Branham's subsequently having withdrawn funds from this account to pay the loan fee. However, even if the loan transaction had been so structured—and it was not—Branham would not necessarily be treated as having "paid" the loan fee. For the critical point which appears from the record before us is that Branham never had unrestricted control over any portion of the loan proceeds, much less over the entire $1,650,000. Its powers in respect of these funds were at all times subject to substantial limitations. Under such conditions, a prearranged retransfer of funds, immediately after they had been deposited in Branham's account, as the final step in an integrated transaction would not constitute the "payment" which gives rise to a deduction by a cash basis taxpayer. *Thomas Watson,* 8 T.C. 569, 579; *T. Harvey Ferris,* 38 B.T.A. 312, 317, affirmed per curiam 102 F.2d 985 (2d Cir.). Cf. *Newton A. Burgess,* 8 T.C. 47, 50. Moreover, there is no evidence that Branham had sufficient assets—apart from the loan proceeds—from which it could have paid the loan fee in full. Cf. *G. Douglas Burck,* 63 T.C. 556, 559–560, affirmed 533 F.2d 768 (2d Cir.).

We turn now to petitioners' alternative position, namely, that Branham is in any event entitled to a 1970 interest deduction of $16,500 in respect of its check in that amount dated December 15, 1970, which it gave to Great Western. In light of the evidence, it is plain to us that Branham did not thus "pay" any "interest" to Great Western. The $16,500 was placed in a "suspense account" when it was first received by Great Western. Notwithstanding any expectations which he may have had initially, petitioner Rubnitz (acting for Branham) knew—before he signed the final loan agreements—that the $16,500 had not been credited against the loan fee. Moreover, the only instructions appearing in the record with respect to the disposition of funds in the suspense account direct that "This amount [is] to be refunded from suspense account when escrow closes." To be sure, Rubnitz testified that he made arrangements for this amount to be refunded only after the loan had been closed. But his testimony did not

establish whether his understanding with Great Western that it would make the refund was reached before or after the end of 1970. And, on the basis of the record as a whole, it appears to us that before the end of 1970 *both* the borrower and the lender recognized that the $16,500 was a refundable deposit. As such, it may in no way be considered an expense paid during that year.[9] Cf. *Andrew A. Sandor,* 62 T.C. 469, 482, affirmed per curiam 536 F.2d 874 (9th Cir.); *Mann v. Commissioner,* 483 F.2d 673 (8th Cir.), reversing a Memorandum Opinion of this Court. Therefore we need not decide whether a different result would be required if Branham had not consented to the manner in which Great Western handled these funds. Cf. *Renato R. Valente,* T.C. Memo. 1975–200, 34 T.C.M. 861, 1975 P-H Memo. T.C. par. 75,200.

*Decision will be entered for the respondent.*

---

[9] Even if $16,500 were not to be refunded when the loan was closed, the question would still remain whether it would have to be treated as a nondeductible item for 1970. See second paragraph of n. 8, *supra.*

A different analysis would of course be required if the loan had not been closed and the $16,500 had been forfeited to the bank.