H. C. FRANKLIN AND MARJORIE FRANKLIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9657–78.     Filed August 4, 1981.

*Hubert D. Johnson,* for the petitioners.
*William P. Hardeman,* for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal individual income tax against petitioners for 1973 and 1974 in the amounts of $61,293.85 and $111,465.77, respectively. In connection with issue (2) *infra*, petitioners claim overpayments for both years. The issues for decision are as follows:

(1) Whether petitioners are entitled to deduct $120,124.99 and $206,414.49[1] as interest paid for 1973 and 1974, respective-

---

[1] Petitioners deducted $217,491.27. On brief they concede $11,076.78 of this amount.

ly, under section 163,[2] as a consequence of petitioner-husband's transactions with a bank; and

(2) Whether, if petitioner-husband's transactions do not result in his being treated as having paid interest, petitioners' method of accounting should be changed to permit interest deductions.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition in this case was filed, petitioners H. C. Franklin (hereinafter sometimes referred to as Franklin) and Marjorie Franklin, husband and wife, resided in Dallas, Tex.

Franklin and Camille Franklin, his then wife of many years, were divorced on March 10, 1972. As an incident to that divorce and the related property settlement, on March 9, 1972, Franklin borrowed $2,250,000 evidenced by his promissory note (hereinafter sometimes referred to as the 1972 principal note) of the same date, payable to the Capital National Bank in Austin (hereinafter sometimes referred to as Capital National), at Austin, Tex. On that same date, Franklin opened a demand deposit account at Capital National (hereinafter sometimes referred to as the account), which was credited with the $2,250,000 thus borrowed. This $2,250,000 amount was much larger than any previous borrowing by Franklin; up to that time the most Franklin had owed at any one time had been between $300,000 and $400,000. Franklin drew a check dated March 13, 1972, on the account for $1,869,289.67 payable to Camille Fryar Franklin.

The 1972 principal note was payable to Capital National on or before March 9, 1973. The note states that it or "any renewal or extension thereof or participation therein" is secured (1) by Franklin's pledge of 8,000 shares of common stock of Lone Star Co. (hereinafter sometimes referred to as Lone Star) registered in Franklin's name;[3] and (2) by a "Take

---

[2]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.

[3]Franklin was chief executive officer of Lone Star, a wholesale alcoholic beverage

Out Commitment" between Capital National and Lone Star, as follows:

### Recitation

Contemporaneously herewith, [Capital National], Austin, Texas, has loaned and advanced to [Franklin], of Dallas County, Texas, the sum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00). Such indebtedness is evidenced by a promissory note dated March 9, 1972, bearing interest at the rate provided therein, is due on or before one year from date and is secured by the pledge of 8,000 shares of the common stock of [Lone Star] owned and registered in the name of [Franklin]. [Capital National] has sold, and in the future may sell, participations in such loan and indebtedness to other banks and financial institutions. It is hereby agreed to by [Lone Star] that any such banks or other financial institutions which may at any time own any part of such indebtedness shall be protected by this agreement and share the benefits, including the right of enforcement, pro rata in accordance with their respective shares of ownership of such debt.

### Commitment

[Lone Star], which hereby avoids the legal obligation to buy at book value any shares of its common stock tendered to it by its stockholder, [Franklin], in accordance with the terms of agreement set forth on its stock certificates and in the minutes and by-laws of such corporation, and in consideration of [Capital National] and its participants making such loan or purchasing participations therein, and to secure payment thereof by the execution and delivery hereof, has agreed and hereby agrees:

1. That [Lone Star] will purchase at maturity or upon default of [Franklin] in any manner the promissory note above described, or any renewal or extension thereof or participation therein, at par in an amount equal to the unpaid balance of principal and interest thereon, within thirty days following written demand by the undersigned bank to so purchase.

2. That [Lone Star] will notify [Capital National] in writing ten days in advance of any proposed corporate reorganizations or changes affecting the stock pledged hereunder.

[Capital National], for itself and on behalf of its participants, agrees that it will notify [Lone Star] of any default (or of any assertion by said bank that a default has occurred) of [Franklin] on any obligation or duty he may have pertaining to the indebtedness described herein, or the collateral securing its payment before taking any action with respect to such collateral.

EXECUTED this 9th day of March, 1972.

In March 1972, Capital National sold participations in the 1972 principal note to various banks (hereinafter sometimes

---

company with branches in various cities in Texas. The book value of the 8,000 shares of Lone Star pledged on Mar. 9, 1972, as determined by the value as of Feb. 29, 1972, was $3,144,400, or $393.05 per share.

collectively referred to as the participating banks) in Texas, and made partial repurchases of some of those participations, as shown in table I.

TABLE I

| | Sales | | | Repurchases | |
|---|---|---|---|---|---|
| Date | Amount | Bank | Date | Amount | Bank |
| Mar. 9 | $625,000 | Frost National Bank, San Antonio | Mar. 15 | $125,000 | Frost National Bank, San Antonio |
| Mar. 9 | 625,000 | Continental Bank, Houston | Mar. 15 | 125,000 | Continental Bank, Houston |
| Mar. 10 | 75,000 | First National Bank, San Augustine | Mar. 15 | 5,000 | First National Bank, San Augustine |
| Mar. 10 | 150,000 | San Benito Bank & Trust Co., San Benito | | | |
| Mar. 15 | 500,000 | Fort Worth National Bank, Fort Worth | | | |

Thereafter, from March 15, 1972, until March 9, 1973, the participations in the $2,250,000 loan to Franklin were as shown in table II.

TABLE II

| Bank | Amount |
|---|---|
| Capital National | $530,000 |
| Frost National Bank, San Antonio | 500,000 |
| Continental Bank, Houston | 500,000 |
| Fort Worth National Bank, Fort Worth | 500,000 |
| San Benito Bank & Trust Co., San Benito | 150,000 |
| First National Bank, San Augustine | 70,000 |
| | 2,250,000 |

Each of the participating banks received a certificate of participation in the following form from Capital National:

CERTIFICATE OF PARTICIPATION
NON-NEGOTIABLE

Re:

Gentlemen:

This certificate evidences your participation with us in a $ _____ note to _____ dated _____ . Said note matures ·____ with interest payable at maturity at the rate of ____ % from ____ . We have this date sold to you a participation in the amount of $ ____ [at] ____ % with ____ accrued interest ____ .

The execution of this participation agreement shall not limit or affect our discretion in exercising or refraining from exercising without notice to you any and all rights afforded to us by the above mentioned note or any other

paper or document relating thereto, our sole responsibility to you being to exercise the same care that we exercise in the making and handling of loans for our own account and to account to you for your pro rata share of the net amount of all payments actually received by us with respect to the said note. The right to repurchase all, or any part of this Participation is reserved to [Capital National], Austin, Texas.

The ledger sheet maintained by Capital National relating to the loan to Franklin, for the period from March 9, 1972, through March 13, 1973, shows a running balance, as well as debit and credit entries reflecting the sales and repurchases of participations, respectively.[4]

When the 1972 principal note matured, on March 9, 1973, the unpaid interest then owed on it equaled $120,124.99. On that date, Franklin borrowed $120,124.99 from Capital National, executing a promissory note (hereinafter sometimes referred to as the 1973 interest note) for that amount payable on or before 1 year from that date to Capital National.

The terms of the 1973 interest note are similar to those of the 1972 principal note, including the provision regarding possible participation and the pledge of stock with its related agreement, described *supra*. The 1973 interest note also states as follows:

The funds from this note have been advanced to [Franklin] for the purpose of payment of interest of one promissory note dated March 9, 1972, in the original principal sum of $2,250,000 executed by [Franklin] payable to the order of [Capital National], such note being renewed and extended in the same amount of original principal balance.

The $120,124.99 thus borrowed was deposited into the account on March 9, 1973. Franklin gave Capital National his personal check for $120,124.99. The check is drawn to Capital National on the account, is dated March 9, 1973, and bears the notation "Interest on Note dated 3/9/72."[5] On March 15, 1973,

---

[4]This ledger sheet also shows a $25,000 item in the column headed "INTEREST," with a date of Dec. 29, 1972. Neither a debit nor a credit is associated with this $25,000 item on this ledger sheet and no change is shown on the running balance of this ledger sheet on account of this $25,000 item.

[5]Stipulation 13 refers to "This interest payment made by such check." Since the central dispute between the parties is whether Franklin made a payment of interest by this check, and we do not believe the parties understood that they were stipulating the answer to this question, we treat the stipulation as merely an indication of the relationship of the check and the interest *liability*.

Capital National disbursed $110,545.34 of this amount to the participating banks in accordance with their rights under their certificates of participation; Capital National retained $9,579.65.[6]

Capital National did not sell any participations in the 1973 interest note.

The 1972 principal note was renewed by a promissory note dated March 9, 1973 (hereinafter sometimes referred to as the 1973 principal renewal note), payable to Capital National on or before 1 year from its date and containing the same recitations regarding possible participation and the pledge of stock as appear in the 1972 principal note.

The 1973 principal renewal note also contains the following recitation:

> This note is a renewal and extension, but not an extinguishment of that one certain promissory note dated March 9, 1972, [the 1972 principal note] executed by [Franklin] to [Capital National].

The participating banks initially continued to participate in the first $2,250,000 renewal note in the same manner they had in the original $2,250,000 note (see table II *supra*, and note 8 *infra*.) As reflected in the balance column of its ledger sheet, Capital National's share of the amounts borrowed by Franklin was the $530,000 participation plus the $120,124.99 of the 1973 interest note, or a total of $650,124.99.

On March 9, 1974, when the 1973 principal renewal note and the 1973 interest note matured, accrued interest equaled $206,414.49 and $11,076.78, respectively, for a total of $217,491.27. On that date, Franklin borrowed $217,491.27 from Capital National, executing a promissory note (hereinafter sometimes referred to as the 1974 initial interest note) for that amount payable on or before 1 year from that date to

---

[6]The disbursements and retention were in the following amounts:

*Disbursements*

| | | |
|---|---|---|
| Frost National Bank, San Antonio | $32,368.16 | |
| Continental Bank, Houston | 32,347.60 | |
| Fort Worth National Bank, Fort Worth | 31,777.41 | |
| San Benito Bank & Trust Co., San Benito | 9,533.22 | |
| First National Bank, San Augustine | 4,518.95 | $110,545.34 |

*Retention*

| | |
|---|---|
| Capital National (also see note 4 *supra*) | 9,579.65 |
| | 120,124.99 |

Capital National. The terms of the 1974 interest note are similar to those of the 1973 interest note, including the provision regarding possible participation and the pledge of stock with its related agreement, described *supra*. In addition, the 1974 interest note states as follows:

The funds from this note have been advanced to [Franklin] for the purpose of payment of interest of two promissory notes dated March 9, 1973, in the original principal sums of $2,250,000 and $120,124.99 executed by [Franklin] payable to the order of [Capital National], such notes being renewed and extended in the same amount of original principal balance, each.

No deposit credits were made or checks written to disburse the $217,491.27; Capital National evidenced the funding of this loan by credit and the disbursements by corresponding debits.

The amounts received from Capital National as interest ($188,865.99 of the $217,491.27) and principal by the participating banks in March and April 1974, are set forth in table III.

TABLE III

| Bank | Date | Interest | Principal |
|---|---|---|---|
| Frost National Bank, San Antonio | Apr. 10 | $49,904.09 | $500,000 |
| Continental Bank, Houston | Mar. 14 | [7] 46,479.43 | 500,000 |
| Fort Worth National Bank, Fort Worth | Apr. 10 | 49,904.09 | 500,000 |
| San Benito Bank & Trust Co., San Benito | Mar. 19 | 14,108.18 | 150,000 |
| First National Bank, San Augustine | Apr. 10 | 6,411.21 | 0 |
| Granger National Bank, Granger[8] | Apr. 10 | 714.47 | 0 |
| Home State Bank, Marble Falls[8] | Mar. 29 | 4,683.70 | 100,000 |
| Nueces National Bank, Corpus Christi[8] | Mar. 25 | 1,810.16 | 45,000 |
| Commercial Bank & Trust Co., Midland[8] | Mar. 29 | 14,580.66 | 350,000 |
| | | 188,865.99 | 2,145,000 |

No participations in the 1974 interest note were sold by Capital National.

---

[7]The amount in the table is consistent with the stipulated total, but is $270 more than the amount shown on the underlying ledger sheet. This discrepancy does not affect the decision in the instant case.

[8]The record does not permit us to make a finding as to when or under what circumstances the four specified banks became participating banks.

The 1973 principal renewal note and the 1973 interest note were renewed by separate notes dated March 9, 1974 (hereinafter sometimes referred to as the 1974 principal renewal note and the 1974 interest renewal note, respectively). Both the 1974 principal renewal and the 1974 interest renewal notes were payable to Capital National on or before 1 year from their date; they contained the same recitations regarding possible participation, the pledge of stock, and the notes' status as renewals and extensions, as appear in the 1973 principal renewal note (except that the 1974 interest renewal note referred to the 1973 interest note).

As of March 9, 1974,[9] Franklin owed three notes bearing that date: (1) The 1974 principal renewal note ($2,250,000) in which there was participation, (2) the 1974 interest renewal note ($120,124.99), and (3) the 1974 initial interest note ($217,491.27).

The account was opened on March 9, 1972, and closed on May 29, 1974. During 1973, the maximum deposit balance in the account was $1,000, except during the period from March 9, 1973 (when the $120,124.99 borrowed on the note of that date was deposited), to March 13, 1973 (when a debit was entered for that amount reflecting the clearing of the personal check from Franklin to Capital National). The only other deposit to that account was of the proceeds of the original March 9, 1972, loan of $2,250,000.

On March 10, 1975, Franklin borrowed $2,850,000 on a 91-day note from the Mercantile National Bank at Dallas (hereinafter referred to as Mercantile). The proceeds of this loan were deposited into Franklin's account at Mercantile. A debit to this account was made, in the amount of $2,847,052.59, for a transfer of funds to Capital National for principal and interest on notes, as shown in table IV.

### TABLE IV

| Amount | Purpose |
| --- | --- |
| $2,250,000.00 | Principal on the 1974 principal renewal note |
| 225,616.45 | Interest accrued on the 1974 principal renewal note |
| 120,124.99 | Principal on the 1974 interest renewal note |
| 12,045.40 | Interest accrued on the 1974 interest renewal note |

[9]On that date, the book value of the 8,000 shares of Lone Star stock pledged was at least $4,096,000.

$217,491.27  Principal on the 1974 initial interest note
 21,774.48  Interest accrued on the 1974 initial interest note
2,847,052.59

On or about March 10, 1975, Capital National received the $2,847,052.59 amount from Mercantile, which it disbursed to itself as lender and to the participating banks.

In their petition, petitioners state that (1) "the interest deduction * * * as determined by petitioner" is $120,124 for 1973 and $217,491 for 1974; (2) "the interest deduction * * * as determined by the Commissioner" is zero for 1973 and zero for 1974; and (3) "the interest deduction * * * that would result from a calendar year interest accrual of this deduction" is $203,742 for 1973 and $251,466 for 1974.

On the Schedules F attached to petitioners' Federal income tax returns for 1973 and 1974, all of petitioners' farm income was reported in part I, which is headed "Farm Income—Cash Receipts and Disbursements Method," and no income was reported in part IV, headed "Farm Income—Accrual Method."

Petitioners claimed interest expense as an itemized deduction on their 1973 income tax return in the amount of $123,446.50, which included the $120,124.99 amount of the March 9, 1973, check to Capital National.

Petitioners claimed interest expense as an itemized deduction on their 1974 income tax return in the amount of $222,764, which included the $217,491 amount credited on the 1974 initial interest note.

In the notice of deficiency, respondent disallowed interest deductions as follows:

It is determined that the deductions of $120,124.99 and $217,491.00 claimed for interest, for the years 1973 and 1974 respectively, are not allowable because it has not been established that these amounts were paid. Therefore, your taxable income is increased $120,124.99 and $217,491.00 for these years.

No part of the claimed $120,124.99 and $217,491 was paid in either 1973 or 1974.

OPINION

Respondent asserts that petitioners are not entitled to the claimed interest deductions for 1973 and 1974, because Frank-

lin, who used the cash basis of accounting, did not pay interest to Capital National but merely increased his indebtedness to it. Petitioners disagree, asserting that Franklin borrowed these amounts from Capital National to pay interest owed to the participating banks; in the alternative, petitioners assert that if respondent's disallowance is upheld, then respondent should be required to adjust their interest expense deductions to a method (evidently, an accrual method) that will clearly reflect income. Respondent replies that "Nothing was done in this case to disturb the manner in which petitioner kept his books," and so the question of clearly reflecting income is not before us.

We agree with respondent.

At the outset, we must determine whether petitioners were on the cash basis of accounting during the years in issue. Petitioners do not clearly contend that they were on other than the cash basis during these years; however, (1) they request a finding that their Federal income tax returns "do not reflect that Petitioners were designating the cash basis of accounting for purposes of reflecting the aspect of their business relating to the $2,250,000 borrowing that started in March of 1972 or for any other purpose," and (2) they object to respondent's request for a finding that they were on the cash basis on the grounds that such a finding "is not supported by any stipulation or by any exhibit or by any testimony of witnesses or by any part of the record."

Implicit in the language of the notice of deficiency[10] is respondent's determination that petitioners were cash basis taxpayers in 1973 and 1974. Petitioners, upon whom rests the burden of proving that they were not then on the cash basis (*Rubnitz v. Commissioner*, 67 T.C. 621, 627 n. 7 (1977)), have failed to carry this burden. Indeed, what little appears in the record supports respondent's determination.[11]

---

[10]"the deductions * * * are not allowable because it has not been established that these amounts were *paid*." (Emphasis supplied.)

[11]Firstly, as petitioners demonstrated in their petition, the claimed interest deductions are based on their view of "payments"—a cash concept—and are substantially different from the amounts to which they would be entitled were they reporting on an accrual basis. Secondly, petitioners reported their farm income and expenses on the cash basis.

We hold that petitioners were on the cash basis for 1973 and 1974.

## I. Interest "Payments"

For cash basis taxpayers, section 163(a)[12] generally permits a deduction only for interest "paid" within the taxable year. The payment required to secure a deduction is the payment of cash or its equivalent; the giving of the taxpayers' note is not the equivalent of cash, but only a promise to pay. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 578, 582–583 (1977); *Battelstein v. Internal Revenue Service*, 631 F.2d 1182, 1183–1184 (5th Cir. 1980). See *Heyman v. Commissioner*, 70 T.C. 482, 485 (1978), affd. without opinion 633 F.2d 215 (6th Cir. 1980). Similarly, interest withheld by a lender from loan proceeds is not fully deductible in the year the interest is withheld. *Cleaver v. Commissioner*, 6 T.C. 452 (1946), affd. 158 F.2d 342 (7th Cir. 1946). Likewise, interest debited by a lender to a taxpayer's loan account is not fully deductible in the year of the debit. *Heyman v. Commissioner, supra.* The theory is that there is no distinction between a taxpayer giving a promissory note, having the interest withheld from the loan proceeds (that is, "discounting" the loan), and having the interest debited to the loan account (that is, increasing the loan by the amount of interest). *Heyman v. Commissioner*, 70 T.C. at 485, 487; *Rubnitz v. Commissioner*, 67 T.C. at 627–628.

On the other hand, interest paid to one lender by a cash basis taxpayer with funds borrowed from a separate lender is deductible when the interest is paid, not in the later year when the loan from the second lender is repaid. *McAdams v. Commissioner*, 15 T.C. 231, 235 (1950), affd. 198 F.2d 54 (5th Cir. 1952); *Perry v. Commissioner*, 28 B.T.A. 497, 499–500 (1933). See *Heyman v. Commissioner*, 70 T.C. at 485.

When a taxpayer borrows money from a lender to pay interest due to that same lender, deductibility turns on whether the taxpayer exercises unrestricted control over the borrowed money. Where the taxpayer maintains a bank account at the bank where the loan was obtained, and the

---

[12]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

bank credits the account with the loan proceeds and immediately charges the account for the interest due, the deduction is denied because the lender retains control over the proceeds by virtue of the account maintained with the lender. *Watson v. Commissioner*, 8 T.C. 569, 578–579 (1947); *Ferris v. Commissioner*, 38 B.T.A. 312, 316–317 (1938), affd. per curiam 102 F.2d 985 (2d Cir. 1939). See *Rubnitz v. Commissioner*, 67 T.C. at 629; *Wilkerson v. Commissioner*, 70 T.C. 240, 257–258 (1978), on appeal (9th Cir., Oct. 1, 1979). On the other hand, the deduction has been allowed where the lender gave up control of the borrowed funds, the funds were commingled with the taxpayer's other funds in an account at a bank separate from the lender, and funds from this separate account were used to satisfy the interest obligation. *Wilkerson v. Commissioner*, 70 T.C. at 258–260; *Burck v. Commissioner*, 63 T.C. 556, 559–560 (1975), affd. 533 F.2d 768 (2d Cir. 1976); *Burgess v. Commissioner*, 8 T.C. 47, 50 (1947).

The foregoing concepts result in a discontinuity in the law. Wherever the courts seek to draw an understandable line between these concepts, at some point we find that the line separates cases that have little economic difference between them. Nevertheless, the task falls to us to draw the line and we proceed on the basis that the taxpayer will ordinarily be bound by the tax consequences of the form he has chosen. *Don E. Williams Co. v. Commissioner*, 429 U.S. at 579–580; *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), on appeal (9th Cir., Sept. 12, 1980); *Heyman v. Commissioner*, 70 T.C. at 487.

*A. Payments to Participating Banks*

The loan to Franklin was made by Capital National; the 1972 principal note, the 1973 principal renewal note, and the 1974 principal renewal note all obligated Franklin to Capital National; both the 1973 interest note and the 1974 interest renewal note obligated Franklin to Capital National; the 1972 principal note and the 1973 interest notes were the only ones that resulted in deposits to Franklin's accounts—each resulted in a deposit in Franklin's account in Capital National.

Capital National sold and bought participations in the $2,250,000 loan. As tables I and III demonstrate, the extent of any bank's participation was likely to change from time to time. There is no indication in the record that Franklin entered into different arrangements each time the participa-

tion breakdown changed. There is no indication in the record that a novation occurred on account of any sale or repurchase of a participation. There is not even any indication in the record that Franklin knew of any participation by other banks.

When the 1974 principal renewal note, the 1974 interest renewal note, and the 1974 initial interest note matured, all three notes and the interest thereon were paid by Mercantile to Capital National.

We conclude that the debts evidenced by the 1972, 1973, and 1974 notes, described *supra*, were from Franklin to Capital National only.

Petitioners cite several law journal articles and direct our attention to a manual published by the Comptroller of the Currency. The articles and the manual deal with the usefulness and legitimacy of sales of participations in loans. The articles and manual do not · indicate that the borrower's obligations are changed in any way that affects the rules of law enunciated *supra*. Petitioners also refer us to two revenue rulings[13] which, under certain circumstances, treat mortgage pools as trusts and treat pool certificate holders as having invested in the mortgages held in the pools. The rulings do not deal with the treatment of the mortgagors and the circumstances described in these rulings are not present in the instant case. These rulings quite clearly were developed without consideration being given to the type of dispute presented in the instant case.

In terms of tax policy, we find it difficult to see why the timing of petitioners' interest deduction should be affected by whether Capital National chooses to sell participations (as it did with respect to the 1972 principal note and the 1973 principal renewal note) or to refrain from selling participations (as it did with the 1973 interest note, the $11,076.78 of

---

[13]Rev. Rul. 70–544, 1970–2 C.B. 6; Rev. Rul. 71–399, 1971–2 C.B. 433.

A revenue ruling is no more than an expression of the opinion or position of the Internal Revenue Service with respect to the law applicable to the facts recited therein and does not have the force of law. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Browne v. Commissioner*, 73 T.C. 723, 731 (1980) (Hall, J., concurring); *Benninghoff v. Commissioner*, 71 T.C. 216, 222 n. 4 (1978), affd. per curiam 614 F.2d 398 (5th Cir. 1980).

interest on which petitioners now concede to be nondeductible (see note 1 *supra*)).

We do not purport to lay down a rule that participations are always to be ignored. In the absence of legislation, we will develop our dividing lines at this stage by the process of case-points of payment and nonpayment. See *Harrison v. Schaffner*, 312 U.S. 579, 583–584 (1941).

We see no reason in the statute, the case law, or tax policy to treat the participations in the instant case as affecting petitioners' deductions. We hold that the debts evidenced by the principal notes and interest notes obligate Franklin only to Capital National.

## B. Payments to Capital National

Having rejected petitioners' contention that Franklin borrowed from one bank to pay interest to other banks, we proceed to analyze the tax consequences of the March 9, 1973, and March 9, 1974, interest transactions.

The March 9, 1973, interest transaction falls within the principle established in *Rubnitz v. Commissioner, supra.* In *Rubnitz*, we pointed out (67 T.C. at 628–629) as follows:

it has been consistently held that a cash basis borrower has not paid interest when the loan transaction is structured so that a loan fee is "withheld" by the lender from what is called the principal amount of the loan and only the supposed principal amount minus the loan fee is actually made available for the borrowing taxpayer's use. * * *

That in substance is what happened here. Branham received $1,592,220 from the bank but it promised to repay $1,650,000 plus interest at a specified rate. Of the difference between these figures, $57,750 might well have represented additional interest charges. However, it is plain that Branham did not pay that interest in 1970. Instead, by signing a promissory note, it specifically chose to postpone paying that amount until sometime in the future. The entire $57,780 was to be paid ratably by the borrower over the life of the loan as one component of the monthly installments (beginning March 1, 1972) which would ultimately result in the payment of the full $1,650,000. Therefore, Branham may not deduct the $57,750 as "interest paid" during 1970.

Petitioner's argument to the contrary is unpersuasive. Petitioner suggests that the substance of what occurred in this case was no different from the bank's initially having deposited the full $1,650,000 in Branham's account and Branham's subsequently having withdrawn funds from this account to pay the loan fee. However, even if the loan transaction had been so structured—and it was not—Branham would not necessarily be treated as having "paid" the loan fee. For the critical point which appears from the record before us is that Branham never had unrestricted control over any

portion of the loan proceeds, much less over the entire $1,650,000. Its powers in respect of these funds were at all times subject to substantial limitations. Under such conditions, a prearranged retransfer of funds, immediately after they had been deposited in Branham's account, as the final step in an integrated transaction would not constitute the "payment" which gives rise to a deduction by a cash basis taxpayer. [Fn. ref. omitted.]

In the instant case, (1) the funds never left Capital National, (2) the loan by Capital National to Franklin, the deposit in the account, and the check by Franklin to Capital National were essentially simultaneous, (3) Franklin's other funds in the account were de minimis (less than 1 percent of the amount apparently moving through the account), and (4) the $120,124.99 loan was made "for the purpose of payment of interest of [the 1972 principal note], such note being renewed and extended in the same amount of original principal balance."

Franklin did not have control over the $120,124.99 borrowed from Capital National; there is no difficulty in tracing the funds thus borrowed through to the asserted interest payment. Thus, the transactions between Franklin and Capital National do not meet the standards of the *Burgess-Burck-Wilkerson* line of cases. See *Battelstein v. Internal Revenue Service*, 631 F.2d at 1184–1185.

We conclude that the March 9, 1973, transactions did not constitute a "payment" of interest, within the meaning of section 163(a).

The March 9, 1974, interest transaction likewise falls under the principle established in *Rubnitz v. Commissioner, supra.* As to this transaction, Capital National even more clearly retained control over the $217,491.27 loan proceeds, of which petitioners seek to deduct $206,414.49; no deposits were made nor checks drawn. Franklin simply increased the amount of his debt owed to Capital National by giving a note for $217,491.27.

We conclude that the March 9, 1974, transactions did not constitute a "payment" of interest, within the meaning of section 163(a).

Petitioners' reliance on quotations from *Wilkerson v. Commissioner, supra,* and *Heyman v. Commissioner, supra,* is misdirected because the quotations are summaries of the principle set down in *Perry v. Commissioner, supra,* and *McAdams v. Commissioner, supra,* namely, that interest paid

by a cash basis taxpayer to one lender, with funds borrowed from another lender, is deductible when the interest is paid. The factual situation in the instant case falls outside that principle.

On this issue we hold for respondent.

## II. Change of Accounting Method

Section 446(a) provides as follows:

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

Under section 446(b),[14] respondent has authority to make changes in order to clearly reflect the taxpayer's income.

In the instant case, we have concluded that respondent determined that petitioners were on the cash basis and that petitioners failed to prove that this determination was in error.

Respondent has not purported to exercise his authority under section 446(b) and disavows any intention to exercise this authority. Respondent merely has determined the consequences of following through on petitioners' method of accounting and we have agreed with respondent's analysis.

We conclude that respondent is not required to change petitioners' method of accounting. Petitioners have not shown that they are entitled to be on any method that would permit them to deduct any interest on account of the transactions described in our findings of fact *supra*, in determining their Federal income tax liabilities for 1973 or 1974.

In their argument on this issue, petitioners rely on three cases and two revenue rulings.

In both *Jones v. Commissioner*, 306 F.2d 292 (5th Cir. 1962), revg. a Memorandum Opinion of this Court,[15] and *Patchen v. Commissioner*, 258 F.2d 544 (5th Cir. 1958), revg. and affg. 27

---

[14]SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[15]T.C. Memo. 1960–115.

T.C. 592 (1956), the Court of Appeals concluded that the taxpayers there involved had in earlier years kept their books on the cash basis and that they had not requested permission to change to an accrual basis. The Courts of Appeals declined to accept respondent's position that he had impliedly consented to a change in the taxpayers' recordkeeping methods. In the instant case the record contains no evidence as to petitioners' books for earlier years. We have here no evidence from which we could conclude, as did the Court of Appeals in *Jones* and *Patchen*, that consistency would be furthered by yielding to petitioners' request that they be treated as though they had kept their books on an accrual basis. *Burck v. Commissioner*, *supra*, and Rev. Rul. 68–643, 1968–2 C.B. 76 (see note 13 *supra*), involve the deductibility of prepaid interest; in the instant case not only is there no prepaid interest in issue, there is no interest paid at all. The other ruling, Rev. Rul. 71–431, 1971–2 C.B. 224, involves a bank's right to deduct interest credited to depositors' accounts and to reserve accounts when the credited amounts are available for withdrawal by the bank's depositors. From this, petitioners draw a conclusion about fiscal years that seems unwarranted by the ruling and irrelevant to the instant case.

On this issue, also, we hold for respondent.

*Decision will be entered for the respondent.*