DELFORD G. WILLIAMS AND ERESTEEN R. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 13963-79.
United States Tax Court
T.C. Memo 1981-643; 1981 Tax Ct. Memo LEXIS 96; 42 T.C.M. (CCH) 1616; T.C.M. (RIA) 81643; November 4, 1981. Hallison H. Young, for the petitioners. Larry D. Anderson, for the respondent. DAWSON
MEMROANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1973 and 1974 totaling $ 3,627.21 and $ 2,132.09, respectively. During the years in issue the petitioners were limited partners in the Royal Oak Tower Limited Dividend Housing Association, a partnership formed in December 1973 to construct and operate a senior citizens rental project. Respondent disallowed their distributive share of certain expenses deducted by the partnership. After *97 concessions the only issue for decision is whether the partnership was entitled to a deduction for a loan commitment fee in excess of the amount allowed by respondent as an amortization deduction for the 1974 taxable year. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and the attached exhibits are incorporated herein by reference. The pertinent facts are summarized below. Petitioners Delford G. Williams and Eresteen R. Williams resided in Detroit, Michigan when they filed their petition in this case. they filed their joint Federal income tax returns for the taxably years 1973 and 1974 with the Internal Revenue Service Center in Cincinnati, Ohio. The Royal Oak Tower Limited Dividend Housing Association (Royal Oak Towers) was formed on December 27,1973 to construct, own and operate a senior citizens rental project. The project was financed by the Michigan State Housing Development Authority (MSHDA). The MSHDA is a state agency created in 1966 under the State Housing Authority Act of 1966 of the State of Michigan. The MSHDA finances construction and operation of housing units for persons of low and moderate incomes by loaning to developers *98 funds obtained through the issuance of notes and/or bonds. Generally the construction phase of a project is financed with the proceeds of note issues, while the permanent financing is accomplished through the issuance of long-term bonds. The Department of Housing and Urban Development (HUD) is an agency of the Federal Government which administraters the various low income housing programs enacted as part of the National Housing Act of 1969. HUD, acting through the Federal Housing Commissioner, agreed to assist the project under Section 236 of the National Housing Act by making monthly interest reduction payments directly to the lender on behalf of Royal Oak Towers, thereby effectively reducing the interest rate on the mortgage. The partnership was required to pass the benefits of this subsidy along to the eligible project residents in the form of lower rents. During the years in issue MSHDA generally collected a commitment fee from developers at the initial closing of the mortgage loan equal to 3-3/4 percent of the principal amount of the loan. The income derived from the commitment fees was used by MSHDA to defray certain costs associated with processing the loans. In a *99 report dated September 18, 1975, the State of Michigan Department of Social Services recommended to MSHDA that it adopt a loan commitment fee allocation which had been prepared by the accounting firm of Coopers & Lybrand. The report emphasized that in order to attract investors a developer had to offer a yield on the investment which was competitive with other forms of tax-sheltered investment. The report further noted that, if the loan commitment fee were to be amortized over the combined periods of the construction and permanent financing, the potential yield to the investor would be significantly less than the yield which would result if the commitment fee were expensed entirely during the construction period. Under the Coopers & Lybrand formula 81 percent of the commitment fee was deemed to be attributable to expenses incurred by MSHDA in processing the construction loan, and the remaining 19 percent was allocated to services provided in connection with the permanent loan, as follows: ALLOCATION OF 3-3/4% COMMITMENT FEE: PERCENTAGE OF
TOTAL FINANCING
FEE USED FOR
THE ACTIVITY
A. Construction Loan Related Expenses
1. Development Division and Detroit
Office personnel to process construction
loan applications, perform
feasibilty analysis including
market analysis, coordination of
architectural, engineering and cost
estimating reviews, etc. (Excludes
personnel working on single family
loans, seed loans, etc.)
47.0
2. Consultant expenses incurred for
cost estimators, credit reporting
services, appraisers, etc.
13.0
3. Management Division personnel to
review feasibilities.
4.0
4. Operations Division personnel to
conduct construction loan closings
and handle construction problems.
7.0
5. Finance Division personnel to
process construction draws, review
builder's insurance coverage, review
builder's and sponsor's financial
condition, etc.
3.0
6. Financing costs incurred to borrow
funds to finance construction
loans.
7.0
81.0
B. Permanent Loan Related Expenses
1. Management Division Personnel to review
management and marketing plans, etc.
1.0
2. Construction Division personnel to
review construction loans, perform
construction inspections, etc.
5.0
3. Consultant Expenses incurred for
review of architects and engineers.
13.0
100.0
*100 On September 23, 1975, MSHDA passed a resolution which adopted the Coopers & Lybrand allocation. In October 1973 MSHDA executed a Mortgage Loan Commitment whereby MSHDA agreed to provide both the construction and permanent financing for the Royal Oak Towers project. [1] The commitment also required Royal Oak Towers to pay a commitment fee of $ 137,987 to MSHDA prior to or concurrently with the disbursement of the mortgage loan proceeds. This amount represented 3-3/4 percent of the face amount of the mortgage note ($ 3,679,645). The mortgage note was executed by the parties on December 27, 1973. It provided for payments of interest only through June 1975. Thereafter principal and interest were payable in equal monthly installments over a period of 480 months. *101 The note specified an initial annual interest rate of 5.25 percent. The note further provided that MSHDA could change the interest rate unilaterally at any time, but that the rate could at no time exceed an amount equal to MSHDA's effective interest cost with respect to the loan plus 1-1/2 percent. The effective interest cost to MSHDA was to be determined by reference to the interest rate which MSHDA was required to pay on notes and bonds sold to finance the project. The financing of the Royal Oak Towers project required an initial closing before the commencement of construction and a final closing upon completion. According to the Mortgage Loan Commitment, the initial closing was conditioned on MSHDA approval of a number of different documents to be prepared by the borrower, including the note and mortgage, the construction contract between the borrower and contractor, an MSHDA Building Loan Agreement governing construction draws on the loan proceeds, a title insurance policy, payment and performance bonds, and an MSHDA Regulatory Agreement limiting the rents and profits to be received by the borrower. Upon execution of the necessary legal documents the loan proceeds were to *102 be disbursed in accordance with the terms of the Building Loan Agreement. Other events required to take place at the initial closing were the payment of the loan commitment fee (if not already paid) and the establishment of a working capital deposit to be used for the payment of taxes, insurance premiums and other expenses incurred during the construction period. The primary purpose of the final closing was to amend the mortgage note to reflect the actual funds advanced during the construction period. Other matters which were taken care of at the final closing were the creation of the Development Cost Escrow and Equity Escrow accounts pursuant to the terms of the MSHDA Regulatory Agreement, and the return of the working capital deposit to the borrower. The final closing was expressly conditioned on the completion of construction to MSHDA's satisfaction, the payment of all construction expenses and certification of such expenses by the partnership, and the absence of any third-party liens on the project. At the final closing of the Royal Oak Towers financing an additional mortgage note in the amount of $ 73,592 was executed by the partnership to reflect additional borrowings *103 attributable to increased development costs. The terms of the original note and mortgage were not changed. Royal Oak Towers used the cash method of accounting. On its Federal income tax return it reported losses of $ 237,987 and $ 155,780 for the years 1973 and 1974, respectively. It reported no rental income for either of these years. The petitioners' pro rate share of the losses was $ 11,271 in 1973 and $ 7,010 in 1974. In computing its 1973 taxable income the partnership deducted the entire loan commitment fee of $ 137,987. Respondent disallowed this deduction and also disallowed $ 50,000 of a claimed $ 100,000 supervisor's fee. For 1974 respondent again disallowed $ 50,000 of a claimed $ 100,000 deduction for a supervisor's fee, and also disallowed a deduction for a $ 56,915 development fee. In addition to other miscellaneous adjustments, respondent also allowed an amortization deduction for 1974 for a portion of the loan commitment fee disallowed in 1973. The amount of this deduction was $ 2,484. After these adjustments the petitioners' shares of the partnership losses for 1973 and 1974 were $ 8,903 and $ 4,511, respectively. OPINION The petitioners have stipulated *104 that all of respondent's adjustments for the 1973 and 1974 taxable years were correct with the exception of his treatment of the loan commitment fee of $ 137,987. The petitioners contend that this fee should be allocated 81 percent to the construction period and 19 percent to the permanent loan period in accordance with the Coopers & Lybrand allocation adopted by MSHDA in 1975. They further contend that the amounts so allocated are deductible over their respective loan periods [2] as ordinary and necessary expenses under sections 162 and 212. [3]
*105 Respondent, on the other hand, maintains that the partnership was not entitled to any deduction for the loan commitment fee in excess of the amortization deduction which respondent allowed for the 1974 taxable year. In support of his position respondent advances essentially two arguments. First, he argues that the commitment fee was a nondeductible capital expenditure since the partnership was not yet engaged in a trade or business during the years in issue, as evidenced by the fact that no rental income was received during those years. Second, even assuming the partnership was engaged in a trade or business, respondent takes the position that only one loan existed and the commitment fee was required to be amortized ratably over the combined periods of the permanent and construction financing. We hold for respondent on the basis of his second position. This is not the first time we have been confronted with the construction loan/permanent loan issue. In Lay v. Commissioner, 69 T.C. 421, 435-436 (1977), this Court was asked to decide the proper timing of deductions for certain fees paid to obtain financing for residential housing projects. The financing fees *106 were stipulated by the parties to be in the nature of interest. Although arrangements had been made for the Federal National Mortgage Association (FNMA) to purchase the loans from the private lenders upon completion of construction, both of the lenders elected to retain the permanent loans rather than sell them to FNMA. The taxpayer contended that interest and expenses properly attributable to the construction phase were deductible ratably over such period. However, we refused to permit a bifurcation of the loan period for amortization purposes. We emphasized that, although the notes and mortgages could be sold or assigned at the conclusion of the construction phase, each partnership had negotiated only one loan spanning both the construction and permanent financing periods: Here each partnership negotiated a single loan secured by a 40-year mortgage. The fact that the mortgage note could later be sold by the holder on the secondary mortgage market has no bearing on the disposition of the first transaction except as to who is the ultimate receiver of payments owed. * * * Petitioner is bound by the provisions of each original loan document terms extending the time period for *107 repayment of each mortgage, here 40 years; terms governing the rate of interest, here 8 1/2 percent on the unpaid balance; and terms securing the property to be used as collateral, here the deed of trusts and the deed of trust notes for each project. Because the mortgage was not altered and because no other mortgage was directly executed between the partnerships (here, the original mortgagors) and any secondary mortgagees, the 40-year duration of each loan is subject to the amortization period. [Footnote reference omitted.] [Lay v. Commissioner, supra at 435-436.] We took a similar approach in Wilkerson v. Commissioner, 70 T.C. 240, 261-263 (1978), reversed on another issue 655 F.2d 980 (9th Cir. 1981). The facts of that case differed from Lay in that the private mortgage bankers who provided the construction financing actually sold the notes and mortgages to the permanent lenders (FNMA and the Government National Mortgage Association) upon completion of construction. Notwithstanding that the financing ultimately required the participation of two different lenders, we held that a portion of the 2-percent financing fee *108 charged by the mortgage bankers for services rendered in connection with the loans was required to be amortized over the combined periods of the construction and permanent financing. We noted that (1) with respect to each partnership-borrower only one set of loan documents was employed; (2) the sale of the notes and mortgages to the permanent lenders did not alter the obligations of the partnerships under the terms of the original notes; (3) the mortgage bankers were not obligated to sell the notes on the secondary mortgage market; and (4) the services provided by the mortgage bankers were instrumental in arranging permanent financing for the housing projects. See also Goodwin v. Commissioner, 75 T.C. 424, 442 at n. 13 (1980). Petitioners did not file a reply brief in this case. Their opening brief failed to mention our prior opinions in Lay and Wilkerson. They contend, nevertheless, that in substance there were two distinct loans and thus two distinct amortization periods. To support their argument the petitioners rely on the fact that the construction loan was financed with tax exempt notes, whereas the permanent loan was financed with long-term bonds. *109 They also point to the fact that there were two separate closings required in connection with the financing--an initial closing before the commencement of construction and a final closing upon completion. Finally, they refer to the Coopers & Lybrand allocation indicating that the bulk of the fee charged by MSHDA was attributable to services performed by it during the construction period. After carefully considering petitioners' arguments, it is our judgment that the present fact situation does not call for a different outcome than that reached in Lay and Wilkerson. [4] Although MSHDA used different sources of financing for the construction and permanent financing periods, the fact remains that it was the sole lender throughout the construction and operational phases of the housing project. Furthermore, with the exception of the additional note executed upon the completion of construction to reflect additional borrowings by Royal Oak Towers, only a single note and mortgage were employed by the parties. We see little significance in the fact that the loan required both an initial and a final closing. Whereas the initial closing settled all significant transactions associated *110 with the financing (see Lay v. Commissioner, supra at 436), the primary purpose of the final closing was simply to amend the mortgage note in order to reflect the actual amounts advanced during the construction period. This was to take place only upon receiving the partnership's certification as to the actual construction costs incurred, as well as assurances that all construction expenses had been paid and the project was free from any liens. Instead of amending the original note, the parties merely executed a new note to reflect the excess of the amounts advanced over the loan amount originally specified. The only other events scheduled to occur at the final closing were the creation of certain escrow accounts required under the terms of an MSHDA Regulatory Agreement and the return of a working capital deposit to the partnership. In short, the final closing did not effect any substantive changes in the relationship between the borrower and the lender, and the terms of the original note and mortgage remained unaltered. Consequently, we see no basis for viewing the final closing as an event signifying the termination of one loan and the start of another, as *111 petitioner asserts. It is to be expected that the bulk of the services for which the loan commitment fee was charged would be performed before or during the construction period, and the Coopers & Lybrand allocation bears this out. Yet, there is no evidence to suggest that the benefits derived by Royal Oak Towers from those services did not extend beyond the construction period. To the contrary, we think that the payment for these services was a necessary and integral step in arranging both short-term and long-term financing for the project, and we conclude that the entire 498-month *112 term of the mortgage note was benefited by the outlay. Thus, we hold that the loan commitment fee must be capitalized and amortized accordingly. [5]
In his notice of deficiency respondent allowed an amortization deduction for 1974 in the amount of $ 2,484. No deduction was allowed for 1973, presumably *113 because the partnership was not formed and the mortgage note was not executed until December 27, 1973. It is not entirely clear to us how respondent arrived at the amount of the amortization deduction he allowed for 1974. However, since the petitioners have raised no objection to respondent's calculation or requested any greater amortization deduction, we must assume they have conceded this issue. Thus, in view of their concessions concerning respondent's other adjustments, we find it unnecessary to deal with the issue of whether the deductions claimed by the partnership were ordinary and necessary expenses under sections 162 or 212. To give effect to the concessions and our conclusion on the disputed issue, Decision will be entered under Rule 155. Footnotes
1. Although the Mortgage Loan Commitment was executed in October 1973 by Clyde W. Hall, general partner, on behalf of "Royal Oak Tower, Limited Dividend Housing Associates," the parties have stipulated that the partnership was not formed until December 1973. This is supported by the fact that the Certificate and Agreement of Limited Partnership was not executed by the partners until December 27, 1973. Accordingly, we will assume that the partnership was not in existence until that date.↩
2. The petitioners accept the well-established proposition that charges for services rendered in connection with a loan must be capitalized and amortized over the term of the loan. See, e.g., Lay v. Commissioner, 69 T.C. 421, 437-440 (1977); Enoch v. Commissioner, 57 T.C. 781, 794-795 (1972); Lovejoy v. Commissioner, 18 B.T.A. 1179↩ (1930). However, they contend that in substance there were two loans rather than one, and that the loan commitment fee should be allocated between the two and amortized accordingly. 3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated.↩
4. This is not to say that the construction and permanent loan periods must always be aggregated in order to determine the proper period for amortizing the related loan expenses. For example, where it is clear that the construction and permanent financing are provided by different lenders through separate and distinct loans, expenses directly associated with obtaining the construction loan may be amortizable over the shorter period. See Francis v. Commissioner, T.C. Memo. 1977-170↩.
5. Petitioners also contend that our refusal to recognize the merits of their two-loan theory and commitment fee allocation would frustrate the Congressional purpose in enacting section 236 of the National Housing Act. They argue that Congress expected the various tax shelter benefits of real estate partnerships (including, according to petitioners, the deduction they seek here) to encourage private investors to invest in the low-income housing which the Section 236 program was intended to foster. However, there is absolutely no evidence to suggest that Congress intended to confer special tax benefits to partnerships engaged in the development of Section 236 housing projects above and beyond those benefits already accorded to other taxpayers. See Blitzer v. United States, Ct. Cl. No. 426-76 (Trial Div., Mar. 12, 1981), 47 AFTR 2d 81↩-1005, 81-1 USTC par. 9262.